ULRIKSON, Respondent, v. CHICAGO, MILWAUKEE, ST. PAUL & PACIFIC RAILWAY COMPANY, et al, Appellants.

(268 N. W. 369.)

(File No. 7757. Opinion filed July 11, 1936.)

*Hepperle & Fuller*, of Aberdeen, and *T. M. Bailey*, of Sioux Falls, for Appellants.

*Danforth & Davenport*, of Sioux Falls, for Respondent.

CAMPBELL, J. On November 24, 1932, Thomas Ulrikson, accompanied by his wife, Bessie Ulrikson, was driving his automobile upon a street in the city of Canton and in attempting to cross the tracks of defendant railway company collided with a train, whereby Thomas Ulrikson was severely injured and his wife was killed. She died intestate, leaving as her survivors Thomas and three adult children. A son, Obel Ulrikson, was duly appointed administrator of her estate and instituted the present action in the circuit court pursuant to sections 2929-2931, R. C. 1919, to recover, for the exclusive benefit of the surviving husband and children, damages for her death, claiming the same to have been caused by the negligence and wrongful acts of the defendants, who are the railway company and its employee, the fireman on the locomotive of the train involved in the collision. Defendants answered separately, each interposing a general denial and each

pleading that the accident was caused and contributed to by the negligence of Bessie Ulrikson and of Thomas Ulrikson and did not arise from any negligence or fault of the defendants or either of them. Upon the trial of the issues thus joined, defendants moved separately at the close of all the testimony for directed verdicts, and both motions were granted. Verdict upon all the issues in favor of the defendants was accordingly returned by the jury by direction of the court and judgment subsequently entered thereon. Thereafter, however, the learned trial judge, upon application of plaintiff, made and entered an order granting a new trial and from such order defendants have now appealed to this court.

Appellants maintain, of course, that the verdict directed in their favor and the judgment entered thereon should stand, and that the court erred in granting the new trial. They submit in support of their position four general propositions, as follows:

First, that there is no evidence sufficient to support a verdict finding actionable fault or negligence on the part of appellants or either of them.

Second, that if it should be believed that the evidence would support a finding of negligence on the part of appellants (which appellants do not concede), nevertheless the undisputed evidence conclusively shows that no conduct of appellants was the proximate cause of the accident.

Third, that the evidence conclusively shows contributory negligence on the part of Thomas Ulrikson, the driver of the car and surviving husband, and since he is one of the beneficiaries of this action under the statute (section 2931, R. C. 1919) his contributory negligence bars recovery either in behalf of himself or of any other of said beneficiaries. Hazel v. Hoopeston-Danville Motor Bus Co. (1923) 310 Ill. 38, 141 N. E. 392, 30 A. L. R. 491.

Fourth, that recovery is barred in any event because the undisputed evidence conclusively shows contributory negligence upon the part of Bessie Ulrikson, the decedent.

We will proceed to the consideration of these propositions in inverse order.

■■ In viewing the facts for the purpose of determining the validity or invalidity of appellants' fourth contention, it is

essential to bear in mind that the burden of establishing contributory negligence is upon the appellants. Further, in considering the testimony as a whole, and in drawing inferences therefrom all conflicts, if any there be, must be resolved in favor of respondent, and the view most favorable to respondent must be taken throughout. Respondent is not entitled, however, to have credence given to testimony which is demonstrated as unsound by physical and mathematical facts appearing unquestioned elsewhere in the record. Hickey v. Mo. Pac. Ry. Corp. (C. C. A. 8th Circuit, 1925) 8 F. (2d) 128. In the light of these established principles, we think the facts disclosed by the present record may fairly be stated as follows.

Thomas Ulrikson was a retired farmer 70 years of age. His wife, Bessie Ulrikson, was 66 years of age. They had resided in the town of Canton in Lincoln county, S. D., for about 19 years. Both of them appear to have had approximately normal hearing and vision for their respective ages. Particularly with reference to Bessie Ulrikson, Thomas Ulrikson testified: "My wife's hearing was good. Her eyesight was not so good. She had a cataract on her eye which had been removed 30 or 35 years ago. She had to wear the double lens glasses. In church she could never see the number on the wall. She always asked me for that. She could not see that far. One eye was better than the other. The right eye was poor."

A married daughter of the Ulriksons, 38 years of age, and one of the beneficiaries of this action, testifying with reference to her mother said: "Her health the last four or five years of her life was perfect. * * * She had a cataract on her eye, had it removed many years ago. As to the sight of that eye, I suppose it was a little weaker than the other eye but she had done all her own sewing and things like that that require eyesight. * * * With her glasses on, she could see about as well as I can. I would say with her glasses on she could see as well as a person with entirely normal eyesight. * * * She could not in church read letters on the wall at that distance. * * * She wore double lens glasses."

Thomas Ulrikson owned and operated a Cadillac automobile of the four-door sedan type with glass windows all around, which

was in good operating condition with effective brakes. He had driven a car since 1911 and had always driven a Cadillac. He made frequent use of the automobile and he himself thought, and his wife was justified in believing, that he was skillful and careful in the operation thereof, as the common phrase goes, "a good driver." Bessie Ulrikson did not drive the automobile.

Bartlett street is a graveled public highway running north and south through the town of Canton and one of its main traveled thoroughfares. The right of way of defendant railway company through the town of Canton crosses Bartlett street substantially at right angles and approximately upon the highway grade. At the point of its intersection with Bartlett street the right of way carries two nearly parallel railroad tracks 15 feet apart, running in an easterly and westerly direction. The track lying farthest to the north upon the right of way runs in a westerly direction for some little distance and then swings north and proceeds to Sioux Falls. The other runs in a northwesterly direction from Canton to Mitchell and thence to the Black Hills, and is known in the record as the I. & D. (Iowa and Dakota Division) main line track. A daily passenger train from the west, running from Mitchell to Chicago on the I. & D. main line, was scheduled to arrive at the Canton station at 4:20 p. m., which would require it to cross the Bartlett street intersection about 4:16. The railway company did not maintain a flagman, guard gates, or automatic signal at the Bartlett street crossing.

The residence of the Ulriksons was approximately 6½ blocks north and 3½ blocks east of the Bartlett street crossing. During the entire period of his residence in Canton Thomas Ulrikson had owned a farm south of the town and during most of that period his three married children had resided south of Canton. His customary route in going out to his farm and in going out to visit his children brought him onto Bartlett street from the east about 2½ blocks north of its intersection with the railroad. Reaching Bartlett street at that point, it was his habit to turn onto such street and proceed south thereon across the railroad tracks and thus out of town. He testifies in that regard:

"I always drove Bartlett street. * * * As a rule I made at

least one trip a week to my own farm on an average, and on an average once a week to one or the other of the children.

"During the course of a year I probably got out to my farm and to my children over Bartlett street 100 to 150 times. I would say a hundred anyhow. That was always the street we drove. I made such trips ever since I have been permanently located here in town for about the last 19 years. My wife mostly went with me.

"So far as I and my wife are concerned we would go out on an average something like 52 times a year. In the 19 or 20 years, my wife and I have driven out in the neighborhood of a thousand times. * * * I knew Bartlett street crossing having been over it perhaps something more than a thousand times."

Further, with reference to the railroad tracks and the traffic thereon, he says: "I knew there were two tracks there. I knew that on one of them was the Sioux, or the Chicago train that came in from the Black Hills, and the other was another train that run up to Sioux Falls. I knew that the Sioux train, or the Chicago train, came in on the lower track. I didn't have any definite idea that the train came in at 4:15 in the afternoon. Didn't have any reason to know exactly what time it did come in. I knew it come in from the west regularly, daily, sometime in the afternoon. I knew it was around about four o'clock. I did not know whether the train came in before or after four o'clock. I knew it was around four somewheres."

On November 24, 1932, the train referred to came into Canton from the west on the I. & D. main line track (being the southernmost of the two tracks upon the right of way) on schedule time, reaching the Bartlett street crossing at approximately 4:16 p. m. It consisted of a locomotive and tender, a combination baggage and express car, a mail car, a day coach and a Pullman. The weather was mild, and it was a nice clear day. We judicially notice the approximate location of the town of Canton in Lincoln county, S. D., and that it is between the forty-third and forty-fourth parallels of north latitude and between the ninety-sixth and ninety-seventh meridians of west longitude. Reference to the almanac shows that in that location and on that day the sun's upper limb passed below the horizon at approximately 4.54 p. m. At

4:16 p. m., therefore, the sun was low in the west and within 40 minutes of complete disappearance. Pursuant to the principle of resolving all testimonial conflicts in favor of respondent, we assume, for the purposes of this statement of facts, that the employees of appellant railway company in charge of this train were negligent in the operation thereof as the train approached the Bartlett street crossing in that they failed to maintain a proper lookout, failed to blow the whistle, and failed to ring the bell. It was the duty and intention of the engineer to bring this train to a full stop before passing over a railroad interesection, the "stop board" for such intersection being about a block and a half east of Bartlett street crossing. In view of this intention, the train, for some distance had been "coasting" or, as the engineer phrases it, "drifting in, without pulling steam, only what we call drifting power." Under such circumstances, the engine itself makes appreciably less noise than when it is being operated with a wider open throttle and exhausting more steam. The engineer states that the train as it approached Bartlett street crossing was moving at a speed "a little better than 15 miles an hour." The fireman says, "The train approached Bartlett street crossing at approximately fifteen or sixteen miles an hour." Respondent's witness Williams, a retired railroad employee of some 20 years' experience, who believed himself able to form a fairly accurate estimate of train speed, states, "It didn't seem like it was going over twenty to me. * * * My best estimate is the train was coming about twenty miles an hour. I know they have a stop board down there a couple of blocks. It looked to me as if it was coming in as usual. It wasn't fast." These figures represent the estimates of the respective witnesses. In any event, it is conceded that the train had been continually slowing down for several blocks before the Bartlett street crossing for the purpose of making a complete stop at the stop board a block and a half east of such crossing; and it appears also that when the engineer felt the impact of the collision hereafter to be mentioned he immediately applied the brakes and the train came to a complete stop in approximately its own length, notwithstanding the fact that it was moving on a slight downgrade toward the east. Respondent in his brief (p. 123) takes the position that the train was traveling "around twenty miles an hour," thereby

indicating his view that such rate of speed is the deduction most favorable to his contentions which the testimony warrants.

On the afternoon of the day in question respondent telephoned his parents around 3 o'clock in the afternoon, inviting them to come out to his home. They took their time about getting ready and then got into their car and started out. They drove their accustomed route, coming onto Bartlett street about 2½ blocks north of the railroad crossing and thence proceeding south. They were squarely upon the main line track of appellant company when they were struck by the engine of the moving train whose operation we have previously described herein, and the collision occurred which gave rise to this litigation, resulting, as before stated, in the almost immediate death of Bessie Ulrikson, serious injury to Thomas Ulrikson, and the destruction of the automobile. It should perhaps be stated that there is a very slight downgrade on Bartlett street as the highway approaches the railroad crossing from the north. The street is a residential one and vision of the railroad tracks is more or less obstructed by houses on each side. The last house on the west side of the street before reaching the railroad crossing is the residence of one Williams, located some little distance back from the street line and a little north of the railroad right of way, which extends 50 feet on each side of the center of the I. & D. main line or southernmost track.

The only witness who offers any testimony whatever concerning this brief and disastrous journey is the surviving husband, Thomas Ulrikson, and his story may be fairly summed up in its material particulars about as follows: He occupied the driver's position on the left side of the front seat and his wife sat beside him on his right. He paid no particular attention to the hour when they started out and did not observe the time or know the time further than that he "* * * knew it was around four o'clock somewhere. * * * Did not know how close to four it was." He backed the car out from his home, drove half a block west, then 4 blocks south, where he stopped for a highway intersection and an automobile approaching from the east, then drove west 3 blocks to a point where he reached Bartlett street and turned south. The doors of the automobile were closed and the window glass was turned up all around. He had observed the sun low in the

west, but says that it had not bothered his driving, although he says that in driving south the sun shown upon the windows and glared in his eyes through the window on the righthand side of the car. Turning onto Bartlett street he proceeded toward the railroad crossing, a little over 2½ blocks to the south. He was driving between 10 and 12 miles per hour (between 14 and 18 feet per second) and could have stopped his car at any time in 10 to 12 feet. He did not increase or slacken his forward speed at any time prior to the collision. At a point which he estimates as being "seventy-five to eighty feet north of the tracks" (which would be 90 to 95 feet north of the I. & D. main line track, the tracks being fifteen feet apart) and at a point where his car was shaded from the direct rays of the sun by the Williams' house hereinbefore mentioned, he looked along the track, first to the west and then to the east, and saw nothing. He estimates that from that point he could see the track to a distance of about 135 feet west of the crossing. That he is somewhat in error, either as to the distance north of the crossing from which he made his observation, or as to the distance that he could see along the track to the west, is evidenced by the fact that a photograph, taken from a point in the center of the main-traveled highway 100 feet north of the north rail of the I. & D. main line and looking toward the southwest, very plainly shows a man standing in the center of the railroad track at a point 150 feet west of the crossing and also shows the track itself for a considerable distance to the west of the standing man. He says that when he looked he also listened, but heard nothing; neither whistle, nor bell, nor moving train. After thus looking first to the west and then to the east and listening, he looked to the west a second time from a point which he estimates as being "thirty-five or forty feet approximately north of the tracks" (that is, 50 to 55 feet north of the I. & D. main line track). At this time he was beyond any shadow from the Williams' house and the sun struck on the west windows of the car and, as he puts it, "was a bright glare" and he did not see the train. We reproduce herewith the photograph (Trial Exhibit 3) which was taken with the camera in the center of the main-traveled portion of Bartlett street, 60 feet north of the north rail of the I. & D. track, looking toward the southwest.

The man standing between the rails of the I. & D. track in the photograph is 250 feet west of the crossing. The track is visible for an appreciable distance beyond him and the distance of visibility to the west continues to increase from that point until the crossing is reached. A large scale map (50 feet per inch) prepared by engineers of appellant company and entirely unimpeached, shows that from a point in the center of the main-traveled portion of Bartlett street 200 feet north of the center of the I. & D. main line track the visibility of that track to the west of the crossing is 120 feet. At a point 150 feet north the visibility west is 139 feet; 100 feet north the visibility west is 199 feet; 75 feet north the visibility west is 319 feet; 50 feet north the visibility west is 571 feet; 25 feet north the visibility west is 923 feet. The physical facts demonstrate (assuming, as all the testimony shows, that the speed of the train was approximately twice the speed of the automobile) that the train was well within the range of the

driver's vision at all times from the moment when he was approximately 80 to 90 feet north of the I. & D. main line track until the very instant of collision. If Mr. Ulrikson looked a second time to the west at a point 50 to 55 feet north of the I. & D. main line track, as he says he did, the train at that instant must have been considerably to the east of the standing man in the photograph reproduced herewith and the engine must have been at a point approximately halfway between the standing man and the crossing. Mr. Ulrikson himself blames his failure to see the train at this time to the glare of the sun in his eyes. In a written statement made to the claim agent of appellant railway company about two weeks after the accident, he says: "The sun was shining brightly from the west at that time, and shining on the windows of the auto, made it practically impossible to see anything through the windows. * * * It was the sun shining on the window of auto from the west that blinded us and is the reason we did not see the train coming. * * * We could have seen the train when we were within 50 feet or so of track, but the sun blinded us." In any event, he did not see the train and continued forward at the same speed. Suddenly his wife cried out, "There is the train." At that moment they were between the two tracks (15 feet apart) and almost instantly, before he had time to apply the brakes or make any attempt to turn the car, they were upon the south track and were struck squarely by the engine of the train.

We come now, in the light of the foregoing facts and the necessary inferences therefrom, to a consideration of whether or not the decedent, Bessie Ulrikson, contributed to the causation of the accident in question by her own negligence.

Negligence may be broadly defined as the failure to use the care required by the circumstances, and contributory negligence as the failure of an individual to use requisite care for his own safety when such failure contributes to his injury. The definition given by the American Law Institute in its Restatement of the Law of Torts, § 463, is as follows: "Contributory negligence is conduct on the part of the plaintiff which falls below the standard to which he should conform for his own protection and which is a legally contributing cause, co-operating with the negligence of the defendant in bringing about the plaintiff's harm."

The kind and quantity of care which the conduct of an individual must display under any given circumstances, if he desires to avoid the charge of being negligent or contributorily negligent, is externally imposed according to a somewhat chimerical standard; to-wit, the conduct which it is assumed would be exhibited under the same circumstances by that mythical personage variously denominated in the decisions as the "ordinarily prudent man," or "ordinarily careful man," or "ordinarily reasonable man." The American Law Institute in its Restatement of the Law of Torts, § 283, has christened this artificial arbiter "the reasonable man" and states the broad rule as follows: "Unless the actor is a child or an insane person, the standard of conduct to which he must conform to avoid being negligent is that of a reasonable man under like circumstances."

Professor Bohlen (2 Univ. Pa. Law Rev. 111 at 113) comments upon the nature and function of this imaginary and illusory individual as follows:

"Were the 'reasonable man' identical with the average man and were the question what the average conduct of mankind under similar circumstances is, the question would be purely one of fact— of what is or exists—though involving an enormously extended inquiry as to the conduct of all other men or a great number of other men under similar circumstances. But the 'reasonable man' is not the average man. He is an ideal creature, expressing public opinion declared by its accredited spokesman, whether court or jury, as to what ought to be done under the circumstances by a man, who is not so engrossed in his own affairs as to disregard the effect of his conduct upon the interests of others. He may be called a personification of the court or jury's social judgment. The factor controlling the judgment of the defendant's conduct is not what is, but what ought to be.

"No matter whether the question is determined by court or jury, it is the opinion of the court or jury as to what ought to be done under the circumstances of that particular case which is controlling and which is expressed in its decision. It is the sound judgment, the sense of proportion between the utility of the act and the injury threatened, the valuation of the respective interests concerned and the actual experiences of the court or jury, which is exercised and utilized."

It is often stated in the books that negligence (or contributory negligence) is a question of fact for the jury. This means that it is for the jury to take three steps: First, the jurors must determine from the evidence what actually happened in the case before them. Second, the jurors must evolve from their own inner consciousness, in the light of their knowledge, experience, and ideas of social utility, the applicable standard; that is, they must arrive at an opinion as to what the ordinarily prudent man, or reasonable man, would have done under like circumstances, which, practically speaking, is a somewhat idealized conception of what the jurors believe a good citizen ought to have done if so situated. The third step is to apply the standard thus arrived at to the actual conduct of the defendant or plaintiff as found upon the facts, thereby determining whether the party was negligent or contributorily negligent as the case may be. The elasticity of this scheme and its utter dependence upon the individual views and biases of the particular jurors are readily apparent. As case after case has arisen for decision in the field of torts, many of them appreciably similar upon the facts, there has been exhibited a marked tendency on the part of the courts to crystalize out by judicial decision more definite and specific standards of conduct than the vague and general one furnished by the idea of a jury as to what a hypothetical "reasonable man" would or should do if identically situated. In following out this tendency the courts have at least paid lip service to the broader standard and have customarily handled the matter by saying that it was unreasonable to believe that an ordinarily prudent man would act or fail to act in a certain fashion under certain circumstances; consequently, if any individual did so act or fail to act he must be deemed negligent or contributorily negligent as a matter of law. This trend toward the fixing of specific standards of careful conduct by judicial decision is by some rather deprecated. See a very able and interesting article in South Dakota Bar Journal (July, 1934) vol. III, No. 1, p. 25. Professor Bohlen seems inclined to ascribe the tendency to the fact that a jury is admittedly, in many cases, an extremely unsatisfactory and unreliable instrument for the determination of the social utility of conduct. See Bohlen "Mixed Questions of Law and Fact," 72 Univ. Pa. Law Rev. 111. Mr. Justice Holmes believed this tendency a desirable one and ascribed it to the need for

certainty and predictability in the law, and said ("The Common Law" [Boston, Little, Brown and Company, 1881] p. 110):

"Again, any legal standard must, in theory, be one which would apply to all men, not specially excepted, under the same circumstances. It is not intended that the public force should fall upon an individual accidentally, or at the whim of any body of men. The standard, that is, must be fixed. In practice, no doubt, one man may have to pay and another may escape, according to the different feelings of different juries. But this merely shows that the law does not perfectly accomplish its ends. The theory or intention of the law is not that the feeling of approbation or blame which a particular twelve may entertain should be the criterion. They are supposed to leave their idiosyncracies on one side, and to represent the feeling of the community. The ideal average prudent man, whose equivalent the jury is taken to be in many cases, and whose culpability or innocence is the supposed test, is a constant, and his conduct under given circumstances is theoretically always the same.

"Finally, any legal standard must, in theory, be capable of being known. When a man has to pay damages, he is supposed to have broken the law, and he is further supposed to have known what the law was.

"If, now, the ordinary liabilities in tort arise from failure to comply with fixed and uniform standards of external conduct, which every man is presumed and required to know, it is obvious that it ought to be possible, sooner or later, to formulate these standards at least to some extent, and that to do so must at last be the business of the court. It is equally clear that the featureless generality, that the defendant was bound to use such care as a prudent man would do under the circumstances, ought to be continually giving place to the specific one, that he was bound to use this or that precaution under these or those circumstances. The standard which the defendant was bound to come up to was a standard of specific acts or omissions, with reference to the specific circumstances in which he found himself. If in the whole department of unintentional wrongs the courts arrived at no further utterance than the question of negligence, and left every case, without rudder or compass, to the jury, they would simply confess

their inability to state a very large part of the law which they required the defendant to know, and would assert, by implication, that nothing could be learned by experience. But neither courts nor legislatures have ever stopped at that point.

"From the time of Alfred to the present day, statutes and decisions have busied themselves with defining the precautions to be taken in certain familiar cases; that is, with substituting for the vague test of the care exercised by a prudent man, a precise one of specific acts or omissions. The fundamental thought is still the same, that the way prescribed is that in which prudent men are in the habit of acting, or else is one laid down for cases where prudent men might otherwise be in doubt."

That the process of judicial declaration of specific standards of conduct should be guarded with care and circumspection goes without saying. But the existence of such a process and the continual manifestation thereof in the decisions are inescapable facts. There are, perhaps, few places in the field of tort law where this process is more distinctly observable in operation in recent years than in the host of automobile accident cases, numbers of them arising upon comparable and substantially similar facts.

Obviously the driver of or guest in an automobile, if he would avoid the charge of contributory negligence when injured by the negligence of others, must always exercise such care for his own safety as an ordinarily prudent or reasonable man would exercise under like circumstances. Our further inquiry, however is whether the decisions of the courts have in any degree particularized that general duty by establishing more definite or specific duties of care which such driver and such guest are obligated to perform. It is perhaps unnecessary to say that in speaking of "duty of care" in connection with contributory negligence we use the word "duty" as a matter of convenience and not in its modern juristic sense of the correlative of a legal right. Of course, as has been often pointed out (Kocourek "Jural Relations" p. 9, n. 3; 78 Univ. Pa. Law Rev., p. 740, n. 9), there is no legal duty resting upon any man to exercise care for his own safety in the sense that a breach of such duty gives rise to a legal right in another. Cf. the Austinian distinction between absolute and relative duties, "Jurisprudence," 5th Ed., vol. 1, p. 400. The only result of an

individual's breach of the so-called "duty" to exercise care for his own safety is that such breach may preclude the individual himself from collecting damages for an injury to which it has contributed.

■ We may profitably pursue our inquiry by ascertaining first what, if any, particular duty of care for his own safety the law imposes upon the driver of an automobile, and, for the purposes of the present decision, we may confine ourselves to the case of the automobile driver who knows or is chargeable with knowing that he is approaching a grade railroad crossing. We do not think, as a matter of accepted legal theory, that contributory negligence on the part of the automobile driver constitutes a defense in this case or that such contributory negligence on the part of the driver would be imputable upon this record to the decedent, Bessie Ulrikson. See Miller v. Union Pacific Ry. Co. (1933) 290 U. S. 227, 54 S. Ct. 172, 78 L. Ed. 285; Pemberton v. Fritts (1930) 56 S. D. 374, 228 N. W. 409; Holdhusen v. Schaible (1932) 60 S. D. 275, 244 N. W. 392. Our reason for considering first the situation with respect to the driver is that the cases, in discussing the duty of care resting upon the guest or passenger, usually define such duty by means of comparison with or distinction from the duty imposed upon the driver. So far as the driver is concerned, the general duty of care on approaching a railroad crossing has been rendered specific at least to the extent that it is definitely established as the law of this state that "it is the duty of an automobile driver approaching railroad tracks to look and listen where looking and listening will be effective, and that his failure to do so is contributory negligence as a matter of law." Buboltz v. C. M. & St. P. Ry. Co. (1924) 47 S. D. 512, 199 N. W. 782, 785; Dean v. C., R. I. & P. Ry. Co. (1927) 51 S. D. 233, 213 N. W. 6; Plucker v. C., M. & St. P. Ry. Co. (1928) 52 S. D. 554, 219 N. W. 254; Morrisey v. C., M. & St. P. Ry. Co. (1930) 57 S. D. 495, 234 N. W. 18; Heberer v. C., M. St. P. & P. Ry. Co. (1931) 59 S. D. 123, 238 N. W. 339.

■ In the instant case the automobile driver was intimately acquainted with the crossing in question, having passed over it in the same direction, as he himself says, more than a thousand times. He knew that the view of the tracks to the west was ob-

structed by buildings and that there was really very little vision to the west until the automobile reached a point about 100 feet north of the tracks and that from that point to the crossing visibility constantly increased. He knew that it was about the hour for the passage of a regular daily train from the west which did not stop at that crossing. He looked to the west at a time when he says he was protected from the glare of the sun by the Williams' house and at a point whence he estimated he could see along the track to the west about 130 feet. As a matter of fact, the visibility to the west from that point was probably nearer 190 feet. In any event, he did not see the train and in all probability it was not then within the range of his vision. From that point he continued on toward the track without any slackening of speed, and, while he states that he looked again to the west, he frankly concedes that when he did so the glare of the setting sun upon the windows of the automobile so blinded him that he could see nothing. That such looking to the west was not an effective looking within the meaning of our decisions is quite apparent. As stated by the Supreme Court of Washington in a case where the driver was blinded by an approaching headlight (Jaquith v. Worden [1913] 73 Wash. 349, 132 P. 33, 37 48 L. R. A. [N. S.] 827), "Had he been without eyes or had he closed them, he would have been in no worse position." Nevertheless, with all the knowledge he had, knowing that his only view of the track to the west had been a short distance which he estimated at 130 feet, knowing that thereafter, although visibility to the west increased, yet he could not see at all when he looked to the west because of the blinding glare of the sun, this driver neither stopped his car nor slackened its speed, but proceeded blindly and heedlessly into the zone of danger. That he was contributorily negligent within the rule of our former decisions seems to us entirely clear. And such contributory negligence is not excused by the fact (which we assume) that appellant railway company negligently failed to maintain proper lookout when approaching the crossing and negligently omitted to sound proper signals therefor. Buboltz v. C., M. & St. P. Ry. Co., supra; Schofield v. C., M. & St. P. Ry. Co. (1885) 114 U. S. 615, 5 S. Ct. 1125, 29 L. Ed. 224.

We proceed next to consider the question of the contributory negligence of the passenger Bessie Ulrikson. Here again the per-

tinent facts of the case allow us to impose rather narrow limits upon our discussion. In the first place, we are dealing with the case of a passenger riding gratuitously as the guest of the owner and driver of a private automobile and not with the case of a passenger for hire who has intrusted himself to a carrier such as a taxicab or omnibus company. There is a distinct inference in some of the decisions (the validity of which we need not here undertake to determine) that the standard of conduct to which the passenger is required to conform is appreciably different in the two cases. In the second place, we limit the discussion to the question of the duty of care imposed upon the passenger who is awake, in possession of his faculties and has or is chargeable with knowledge that the automobile is approaching a grade railroad crossing. We need not and we do not here consider such questions as whether the passenger is obligated to stay awake or to what extent he is obligated in general or at all times to pay attention to the road or the operation of the automobile.

The decisions relating to the duty of care resting upon the gratuitous passenger are legion. A very large number of them will be found collected in a series of annotations in 22 A. L. R. 1294; 41 A. L. R. 767; 47 A. L. R. 293; 63 A. L. R. 1432; 90 A. L. R. 984. The point is discussed also in 3 Cornell Law Quarterly 156; 31 Yale Law Journal 101; 6 Minn. Law Rev. 256; 15 Va. Law Rev. 78; 17 Calif. Law Rev. 433; 64 U. S. Law Rev. 57, and 78 Univ. Pa. Law Rev. 736. See, also, Huddy, Cyclopedia of Automobile Law, 9th Ed., vol. 5-6, § 135, et seq.; Berry, Automobiles, 7th Ed., § 5.207, et seq.; Blashfield, Cyclopedia of Automobile Law, Permanent Ed., § 2471, et seq. The precise question has not been before this court, though we have held in two cases not involving a railroad crossing accident that the record facts did not show acquiesence in the driver's negligence as a matter of law (Holdhusen v. Schaible [1932] 60 S. D. 275, 244 N. W. 392) or contributory negligence as a matter of law (Simmons v. Leighton [1932] 60 S. D. 524, 244 N. W. 883). There is not, we think, much difference in the point reached by these two South Dakota cases, though the matter is differently phrased, for, generally speaking, acquiescence of the guest or passenger in the known and perceived negligence of the driver is quite sufficient per se to constitute contributory negligence on the part of the guest or

passenger. Cf. also Miller v. Stevens, 63 S. D. 10, 256 N. W. 152; and Hall v. Hall, 63 S. D. 343, 258 N. W. 491, dealing with passenger's assumption of risk.

Turning to the decisions from other jurisdictions, there is observable in some of them, especially some of the earlier ones, a tendency to hold that the same duty of care and attention which rests upon the driver rests equally upon the guest or passenger. This court has refused to accept that view as a general rule applicable at all times to the conduct of the guest (Simmons v. Leighton, supra), and it has been ably criticized by Mr. Justice Cardozo (35 Harv. Law Rev. 113 at 121) who says in part as follows: "But the courts have in some jurisdictions gone farther. They have held that the same duty that rests upon the driver, rests also upon the passenger. The friend whom I invite to ride with me in my car, and who occupies the rear seat beside me, while the car is in the care of my chauffeur, is charged with active vigilance to watch for tracks and trains, and is without a remedy if in the exuberance of jest or anecdote or reminiscence, he relies upon the vigilance of the driver to carry him in safety. I find it hard to imagine a rule more completely unrelated to the realities of life. Men situated as the guest in the case I have supposed, do not act in the way that this rule expects and requires them to act. In the first place, they would in almost every case make the situation worse if they did; they would add bewilderment and confusion by contributing multitude of counsel. In the second place, they rightly feel that, except in rare emergencies of danger known to them, but unknown to the driver, it is not their business to do anything. The law in charging them with such a duty has shaped its rules in disregard of the common standards of conduct, the every-day beliefs and practices, of the average man and woman whose behavior it assumes to regulate. We must take a fresh start. We must erect a standard of conduct that realists can accept as just." Other of the cases appear to go almost equally far in the opposite direction and hold, in substance, that the guest may rely utterly and entirely upon the driver if the ride is accepted without knowledge of the driver's incompetence and if the guest has no control over him. The sound rule, we think, lies somewhere between these two extremes, though an attempt to state it with any degree of

precision is admittedly difficult and is affected by many considerations.

On the one hand, the courts in general (and very properly) frown upon the practice commonly known as "back seat driving." The automobile fortunately is not, as are some airplanes, fitted with dual controls. It is intended and adapted for operation by one person. No driver can operate an automobile safely or satisfactorily if subjected to continuous interference, suggestions, and advice from passengers. As Judge Cardozo has· pointed out, there should be at least some degree of correspondence between the standards of conduct to be established by the courts and the realities of life. Pertinent in this regard is the language of Professor Mechem (78 Univ. Pa. Law Rev. 736 at page 744). "It is a matter of common knowledge that there are certain social customs which are generally observed even at the risk of personal loss; or, to put it another way, many persons regard it as reasonable to run the risk of personal loss in the observance of customs, if the risk is not too great. These customs function as inhibitions upon the natural tendency of normal individuals to act for the purpose of minimizing a known or suspected danger, and they are important factors in determining the course of human conduct. Of such nature is the custom which deters the guest from advising or criticizing the host, and this applies in the car as well as in the home. The average guest will, no doubt, feel constrained to run some risk of loss or damage rather than the risk of offending the host by interfering or expressing dissatisfaction with his conduct. Of course, there is a point where the line must be drawn, but under modern social standards it seems safe to say that this is a factor which cannot be entirely disregarded if reasonable conduct is to mean anything more than mere conjecture in the realm of the unknown. It is no objection to the consideration of this factor to say that the social standards should be altered or that the guest should disregard them in the face of personal danger, for it is the proper function of the law of negligence to recognize a standard of conduct that is in harmony with existing social conditions, which means that all social factors must be weighed in finding that standard. If this custom or inhibition is a factor in ordering the conduct of society, then its value should not be overlooked in

determining what is reasonable conduct for persons coming under its influence." There must be recognized also the undoubted fact that passengers in an automobile customarily do rely upon the driver thereof and intrust their safety to him to a very considerable extent. How far this may be justifiable will depend upon numerous circumstances, including, among others, the relative experience of the driver and passenger, particularly with reference to the specific conditions which are being encountered in the driving, and the passenger's knowledge of the driver's habits, skill, and ability. Cf. Hall v. Hall, supra.

On the other hand, the decisions plainly indicate that courts, and to some extent juries, have felt that there must be somewhere a limit to the passenger's complete reliance upon the driver. In other words, no passenger in an automobile is entitled at all times and under all circumstances to cast the whole burden of care and responsibility for his own safety upon the driver. It is perhaps more accurate to say that the view is prevalent throughout the decisions that the passenger who exhibits no regard whatever for his own safety but indicates a willingness to intrust himself absolutely to the care of the driver cannot recover from a third person for an injury to which the driver's negligence contributes and which could perhaps have been avoided if the passenger had exhibited a reasonable amount of attention to the matter himself instead of leaving it entirely to the driver. It appears to be felt that the passenger who elects to surrender himself utterly to the driver should himself bear the burden of such election rather than expect to impose it upon a stranger in the event the driver proves negligent. Under such circumstances, so far as concerns social policy and so far as concerns practical result, it does not much matter whether we use the nomenclature of imputed negligence, assumption of risk, or contributory negligence. We might conceivably say that when a passenger completely surrenders all care for his own safety to the driver he thereby voluntarily places himself in such relation to the driver that the driver's negligence will be imputed to him. Or we might say that the passenger is bound to know that all persons, even though ordinarily prudent, may from time to time be negligent and that when he elects to surrender all care for his own safety to the driver he assumes the risk that the

driver may perchance conduct himself negligently. Or we may say that thus wholly to surrender himself to the care of the driver, abandoning all personal attention to his own safety, and making of himself, as some of the cases phrase it, "mere inert freight," is a negligent thing for the passenger to do. As a matter of fact, it is upon this last theory that the courts have, for the most part, proceeded. An excellent discussion of the matter in relation to the point now before us is found in the case of Boscarello v. New York, N. H. & H. R. Co. (1930 112 Conn. 279, 152 A. 61, 63, the court concluding with the following language (omitting citations):

"Because of the very limited nature of the duty of a passenger in an automobile to exercise care to guard himself from dangers incident to its operation, the question of his contributory negligence must usually be one of fact for the jury. There are, however, few situations where watchfulness for his own protection is so within the bounds of reasonable care upon the part of a passenger in an automobile as in the approach to a grade crossing known to him. Almost with unanimity courts have held that in such situations, and in absence of circumstances of excuse, there is a duty resting upon him to be reasonably watchful for the approach of trains. Notes, 18 A. L. R., p. 315, 22 A. L. R. p. 1294, 41 A. L. R. p. 767, 47 A. L. R. p. 295.

"In the case at bar the deceased was riding with a driver who was unfamiliar with conditions at the location, and was looking straight ahead watching the road before him. The deceased, on the other hand, knew of the existence of the track, and must have been familiar with the situation at the crossing. He was seated upon the front seat upon the side from which the train was coming. The view of the track was somewhat obstructed, particularly for the driver on the left side of the seat. The deceased, had he looked with any degree of care commensurate with the needs of the situation, could have seen the train. The automobile was proceeding at only fifteen to twenty miles an hour, and a warning to the driver in time to stop it before reaching the track would not have introduced into the situation any new element of danger, and in all reasonable probability would have been effectual to prevent the accident. No circumstances justifying the failure of the deceased to take any precautions for his own safety appear.

We cannot do otherwise than hold that the deceased was guilty of contributory negligence as a matter of law. We cite a few of the many cases in which, in analogous situations, other courts have reached like conclusions."

This decision, we think, fairly epitomizes the rule which has the support of the better reason and represents the weight of authority.

██ We come then to the application of such rule to the conduct of the decedent in this case. Broadly and generally speaking, the question of negligence or contributory negligence vel non is a question of fact for the jury, but, as we have hereinbefore pointed out, if it is a matter of declaring a standard of conduct or of applying such standard to a set of undisputed conduct facts which are of such a nature that reasonable men could not differ in opinion as to whether or not the exhibited conduct conforms to the established standard, then the matter is for the court. Baltimore & O. Ry. Co. v. Goodman (1927) 275 U. S. 66, 48 S. Ct. 24, 72 L. Ed. 167, 56 A. L. R. 645; Davis v. Pere Marquette Ry. Co. (1927) 241 Mich. 166, 216 N. W. 424; Burboltz v. C., M. & St. P. Ry. Co. (1924) 47 S. D. 512, 199 N. W. 782; Plucker v. C., M. & St. P. Ry. Co. (1928) 52 S. D. 554, 219 N. W. 254; Miller v. Sioux Falls Traction System (1928) 53 S. D. 649, 222 N. W. 270; Morrisey v. C., M. & St. P. Ry. Co. (1930) 57 S. D. 495, 234 N. W. 18; Taecker v. Pickus (1931, 58 S. D. 177; 235 N. W. 504; Fulker v. Pickus (1932) 59 S. D. 507, 241 N. W. 321.

It appears from the record in this case that decedent was chargeable with thorough familiarity with the crossing in question, including its character and nature and the obstructions to the view. It would not be an unreasonable inference to say that her knowledge of the time of day and of the train schedules was substantially the same as that of Thomas Ulrikson. She had entered this automobile at her home but a few moments before, distant only a few blocks, and was riding in the front seat on the right-hand or westernmost side. There were no occupants of the automobile save herself and her husband. She was awake and in full possession of her faculties and is chargeable with knowledge that the automobile was approaching the railroad crossing. When the

automobile was between the two railroad tracks, and almost at the very instant of the collision, she cried out, "There is the train." The fair and reasonable inference upon this record and from the testimony of her husband is that her exclamation coincided with her first perception of the approaching train. So far as concerns her conduct while approaching the crossing, it must be determined by inference from the surrounding facts and principally from the story of Thomas Ulrikson. The permissible inferences, however, are few in number. It is possible that decedent surrendered herself entirely to the care of the driver and neither looked nor attempted to look until she saw the train almost upon them an instant prior to the impact. If so, she was contributorily negligent. Let us assume in her favor, however, that she made some effort to exercise care in her own behalf and to look. If she looked to the west at the time Thomas says that he looked, when the automobile was just passing the Williams' house and it was first becoming possible to see to the west for any distance, she did not see the train, for it was not then within the range of vision from that point. If she refrained from keeping any lookout thereafter, she was contributorily negligent. If she did look thereafter, as she should have done, at a point where there was greater visibility to the west, she must have looked at a point where the train was within range of her vision, and she either saw the train or she did not. As above stated, we think the reasonable inference is that if she so looked she did not see it; but assuming that she did see it, then (particularly in view of the fact that Thomas Ulrikson admittedly was not slackening his speed or in any manner indicating any intention to stop the automobile before coming upon the railroad crossing) she was contributorily negligent in withholding her warning until they were almost upon the tracks and it was entirely too late to stop the automobile. Now, continuing to assume that decedent looked as she should have done after passing the Williams' house and at a time when the train was within the range of vision to the west, let us adopt the alternative and much more reasonable inference that when she so looked she failed (just as Thomas Ulrikson failed) to see the train. Then the further inference is inescapable upon this record that the explanation of her failure to see resides in the same fact that explains the same failure to see on the part of Thomas, to wit, vision blinded by the glare of the rays of the

setting sun upon the glass window of the automobile. We would then have this situation; the automobile continuing toward the crossing at undiminished speed with no sign upon the part of the driver of any intention to stop; the decedent looking toward the west and finding it impossible to see in that direction because of the blinding rays of the sun. She had no reason to believe that the driver could look into the glare of the setting sun any more effectively or with any better results than she could. The most that can be said is that there was perhaps a speculative possibility that the driver could see effectively, notwithstanding the fact that he necessarily looked into the same glare which entirely prevented her from seeing. The probability was, however, in accordance with the actual fact as testified to by Thomas Ulrikson, that the glare blinded him in the same fashion. If the decedent looked to the west at a time when she should have looked and was unable to see in that direction because of the glare of the sun, but nevertheless elected to rely upon the remote possibility that the driver, looking into the same glare, could see, although she could not, we think she gambled upon that possibility at her peril. She made no protest or inquiry and uttered no warning, but passively permitted the automobile to proceed toward the crossing, although she could not see to the west and had no reasonable ground for believing that the driver could see any more or any better than she could.

 It seems to us, upon the record of this case, that any hypothesis as to the conduct of the decedent which the evidence will justify exhibits conduct contributorily negligent as a matter of law.

Respondent cites and much relies upon the case of Miller v. Union Pacific Ry. Co. (1933) 290 U. S. 227, 54 S. Ct. 172, 173, 78 L. Ed. 285, reversing the Circuit Court of Appeals (63 F. (2d) 574), which had affirmed the district court in directing a verdict for the railway company on the ground of the contributory negligence of plaintiff's intestate, a guest or passenger in an automobile. In the Miller Case both the driver and the passenger were killed, and there was no testimony by any one as to what took place in the automobile or what was said or done by either driver or passenger as they approached the crossing. There was testimony as to the physical facts with reference to visibility of the track from the

highway, etc., and the testimony of observers from a distance, who said that the automobile traveled south on the highway at a rate of speed estimated at from 12 to 15 miles per hour with no perceptible increase or diminution thereof and thus proceeded onto the railroad track where it was struck by the engine of an approaching train traveling at 50 or more miles per hour. As stated, both the district court and the Circuit Court of Appeals were of the opinion that the record established contributory negligence on the part. of both driver and passenger. The Supreme Court concurred in that view so far as concerns the driver. With reference to the passenger, however (who, as in the instant case, was the wife of the driver), the court held that the railway company had failed to sustain the burden of proving contributory negligence. As we read the opinion, the court freely concedes that there was a duty resting upon the wife, the passenger, to exercise some care. The court holds, and rightly of course, that in the absence of evidence speaking either one way or the other with respect to contributory negligence the presumption is that due care was exercised. The court specifically observes the entire lack of any direct evidence as to what was said or done by either the driver or passenger. So far as the driver is concerned, the court states that the physical facts show that if he had looked as he should have looked he could have seen the train, and consequently the fact that he drove onto the crossing is sufficient of itself, under the circumstances, to establish his contributory negligence pursuant to the theory (adopted by our own court in the Bulboltz Case and other cases hereinbefore cited) stated by the Supreme Court in the Miller Case by quotation from a previous decision (Northern Pacific Railroad Co. v. Freeman, 174 U. S. 379, 19 S. Ct. 763, 43 L. Ed. 1014) in the following language: "Judging from the common experience of men, there can be but one plausible solution of the problem how the collision occurred. He did not look; or, if he looked, he did not heed the warning, and took the chance of crossing the track before the train could reach him. In either case he was clearly guilty of contributory negligence."

With reference to the wife, however, the court points out that the situation is quite different. She was not in control of the operation of the automobile and consequently, so far as she is concerned,

the charge of contributory negligence is not established by the mere facts, standing alone, that the train could have been observed if proper lookout had been maintained and that if so observed the automobile could have been stopped before coming upon the crossing. As to her, the court says:

"In the present case, as already appears, the burden was sustained as to the husband. It was not sustained as to the wife. As to her, there is an entire absence of evidence on the point. Whatever duty rested upon her under the circumstances, for aught that appears to the contrary, may have been fully discharged. It properly cannot be said from anything shown by the record before us that she did not maintain a careful lookout for the train, or that, if aware of its approach, she did not warn her husband or urge him to stop before entering upon the crossing. * * *

"Here the wife was not in control of the movement of the automobile. She could only note the danger, warn her husband, and urge him to stop. She may have done so, and he, misjudging the situation or taking the chance, have gone forward nevertheless. Or she may have seen the approaching train, observed that her husband was also aware of the fact and, relying upon her knowledge of his habits and character, trusted him, with good reason, until it became too late to interfere, to do whatever was necessary to avoid the danger."

The case before us is entirely distinguishable upon the facts from the Miller Case. We have in the instant case a most important and highly material item of evidence which was entirely lacking in the Miller Case, to wit, the direct testimony of the automobile driver as to what was said and done by the occupants of the automobile as they traveled along the highway toward the railroad crossing. He was called by respondent, and his testimony is binding upon respondent, and he purports to recite the facts and all the facts. We have hereinbefore discussed at some length the inferences as to the conduct of the passenger which we think necessarily arise from the driver's testimony. The evidence of respondent in this case affirmatively and very definitely excludes any possible inference that decedent may have warned her husband, or may have urged him to stop, or may have observed that he was aware of the train. The evidence in the Miller Case, on the other hand, was not sufficient to exclude any of those possibilities.

It is suggested that decedent may have seen the approaching train and may have believed that her husband was also aware of it and would take all necessary precautions; that consequently she did not deem it necessary to mention the matter at all, but rode, calmly along until both automobile and train were within a split second of the crossing and it was manifestly impossible to stop either, when she employed her last breath to utter a perfectly futile warning. As previously stated, if decedent so conducted herself she was contributorily negligent. Upon the record in this case, however, we are entirely unable to believe that she did so conduct herself. Indeed the mere statement of any such hypothesis in the light of the testimony before us seems almost sufficient to demonstrate that it transcends the reasonable and approaches the fantastically conjectural. We do not believe nor can we deem it reasonable to believe that this wife thus rode with her husband, fully cognizant of the peril and yet maintaining complete silence to the very last instant and to a time when warning was worthless. Thomas Ulrikson himself, who had driven with his wife as a passenger many hours over many years and knew her habits and characteristics better than any one else, did not assume anything so incredible and does not give a syllable of testimony that would lend verisimilitude to any such conjecture. Thomas Ulrikson does not testify in this case, "I did not see the train; doubtless my wife saw it but she knew my skill and experience as a driver, and wouldn't think of saying anything about it, knowing full well that I would do whatever was necessary to avoid danger." What Thomas does testify to is a statement, and the only statement, which he (knowing his wife and her habits as he did) believed embodied the truth, to-wit, "* * * It (was) practically impossible to see anything through the windows * * * we did not see the train coming * * * the sun blinded us." And again he testifies, "Then my wife she saw the train, and she hollered, she says: 'There is the train,' and she hadn't more than said it than we were blown up in the air." We are unable to perceive that even the most complete adherence to the doctrine and language of the Miller Case could either require or justify a holding that the decedent in the case before us was not contributorily negligent as a matter of law.

We are of the opinion, therefore, that the learned trial judge

ruled the matter correctly in the first instance when he directed a verdict for defendants below. This view disposes of the case and renders it unnecessary to consider the other contentions advanced by appellants.

The order appealed from is reversed and the cause is remanded, with directions to reinstate the judgment originally entered upon the directed verdict.

W. W. KNIGHT, Circuit Judge, sitting in lieu of RUDOLPH, J., who deems himself disqualified.

POLLEY, P. J., and KNIGHT, J., concur.

ROBERTS and WARREN, JJ., dissent.

ROBERTS, J. (dissenting). There must be some act performed by the deceased or a failure to perform some act required of her which proximately contributed to her death before she can be held to have been guilty of contributory negligence. If, from all the evidence and law applicable thereto, different reasonable inferences could have been drawn by the jury, one tending to prove that deceased exercised ordinary care, the other that she failed to exercise such care as an ordinarily prudent person would under like circumstances, this court cannot determine which inference should have controlled the jury. It is not within the province of this court to substitute its judgment on questions of fact where reasonably fair-minded men might differ. Contributory negligence is a question of law only when the court is impelled to say that from all the facts reasonably fair-minded men can draw but one inference, and that inference pointing unerringly to negligence.

It is well settled that a passenger in an automobile driven and controlled by another is bound to give some heed to his or her own safety, and that ordinary care requires that the passenger maintain a proper lookout. A passenger, however, is not placed in the same legal situation as the driver, and negligence of the driver, approaching a railroad crossing, is not imputable as a matter of law, to the guest having no control or direction over the operation of the automobile. As stated in Miller v. Union P. Ry. Co., 290 U. S. 227, 54 S. Ct. 172, 173, 78 L. Ed. 285: "Whether a passenger or guest in a public or private conveyance, having no control over its movement, may be denied a right of recovery

for personal injury or death on the ground of contributory negligence, depends upon his own failure to exercise a proper degree of care, and not upon that of the driver. This is true where the passenger is the wife of the driver as in other cases. * * * Want of due care for her own safety must be proved; it cannot be presumed. The presumption is the other way."

It is conceded that decedent was not an experienced driver. The husband, on the other hand, had driven an automobile for many years, and in so far as it appears from the record, was competent to operate an automobile skillfully and safely. The facts and circumstances attending the driving of the automobile under consideration are entirely different from instances where the facts show that the passenger was aware of incompetence or of careless and negligent habits of the driver. There were no facts suggesting the need of the exercise of added vigilance. True, the decedent was familiar with the crossing in question, but there was no such circumstance, as appears in the case of Boscarello v. New York, N. H. & H. R. Co., 112 Conn. 279, 152 A. 61, cited in the prevailing opinion. In that case it appears that the passenger riding with a driver who was unfamiliar with the railroad crossing where the accident occurred had information apart from that of the driver indicating to him the danger. The driver made no observations and the jury could have drawn no inference that the passenger who was familiar with the obstructed view at the crossing could reasonably have believed that the driver was exercising vigilance. It does not appear from the record that the driver in the instant case approached the railroad crossing at an excessive speed, needlessly exposing the occupants to peril, and the facts are not comparable to those in Miller v. Stevens 63 S. D. 10, 256 N. W. 152, where the passenger, knowing the danger, voluntarily assumed the risk.

The husband testified that at a point 75 or 80 feet from the crossing he looked to the west, had a clear view and no train was in sight. Continuing to drive at a speed of 10 or 12 miles an hour toward the tracks he looked in the other direction and saw no train. When he was 35 or 40 feet from the tracks he again looked to the west and did not see the approaching train. The record is silent as to any overt action on the part of the deceased aside from

her exclamation, "There is the train," uttered immediately before the collision. There is no evidence that Mrs. Ulrikson did not look and listen for the train. She may have seen the approaching train and may have believed that the driver, having looked in both directions, was also aware of the train and would take necessary precautions. In view of the inexperience of the passenger and what might have been found to be the skill and experience of the driver, approaching the crossing at 10 or 12 miles an hour did not necessarily indicate to decedent that the driver did not intend to stop. A passenger may assume, to the extent that such assumption is not inconsistent with observable facts or conditions of which the passenger is or should be aware, that the driver will do whatever is necessary to avoid danger. She was not called upon to warn the driver of any danger seen by her unless she had reason to believe that he had not seen it. It is not unreasonable to infer that deceased did not make the exclamation until she realized that the driver had not seen the approaching train and intended to cross the tracks. These and other possible inferences were for the consideration of the jury. Southern P. Co. v. Wright (C. C. A.) 248 F. 261, 264, the court holding that the question of the contributory negligence of a passenger riding in a motortruck who was killed in a train collision was for the jury said: "We are not advised whether or not Wright [the passenger] saw the train, as soon as it came into view, a quarter of a mile away, or before it was seen by Tucker. He might have seen it, and yet reasonably have remained silent, for he might naturally have assumed that, the view being unobstructed, Tucker saw it, too, and was governing himself accordingly. So that up to the very time that the truck approached the main track he may have reasonably supposed that Tucker would stop the car in time to avoid a collision. And when he realized that he was going to attempt to cross ahead of the train, what could, or should, he have done? Who can now say as a matter of law? Cry out? He might thus have confused and disconcerted the driver, and an instant of indecision in such a case may be fatal. Here, with the truck a half a second sooner or the train a half a second later, the tragedy would not have happened. It must be borne in mind that there was no time to reflect or reason. If the train was running only 30 miles an hour— the speed was probably greater—it was only about 30 seconds from

the time it came into view a quarter of a mile away until it crashed into the truck." This decision is cited and quoted with approval by the court in Miller v. Union P. R. Co., supra. See, also, Paine v. Chicago & N. W. R. Co., 208 Wis. 423, 243 N. W. 205; Baker v. Lehigh Valley R. Co., 248 N. Y. 131, 161 N. E. 445; Carbaugh v. Philadelphia & R. R. Co., 262 Pa. 25, 104 A. 860; Trenhold v. So. P. Co. (C. C. A.) 84 F. (2d) 452; Chi. & E. L. R. Co. v. Devine (C. C. A.) 39 F. (2d) 537; Wilson v. Puget Sound El. Ry., 52 Wash. 522, 101 P. 50, 132 Am. St. Rep. 1044.

Contributory negligence on the part of the deceased was not so conclusively shown, in my opinion, as to require direction of a verdict on that ground, and the order appealed from should be affirmed.

WARREN, J., concurs in this dissent.