[File No. 7118]

GUSTAVE SCHALLER, Appellant, v. HARRY T. BJORN-
STAD and Eric Erlandson, Respondents.

(40 NW2d 59)

Opinion filed December 1, 1949

*F. J. Graham* and *D. R. Crabtree,* for appellant.

*T. L. Brouillard* (*Nels G. Johnson* on oral argument) for respondent

CHRISTIANSON, J. This is an action for the recovery of damages resulting from a collision between an automobile owned and driven by the plaintiff and a truck owned by the defendant Bjornstad and driven by the defendant Erlandson. The complaint alleges that the collision was caused by the negligence of the defendant Erlandson the driver of the truck and that as a result thereof plaintiff sustained certain personal injuries and that the automobile was damaged, all to the damage of the plaintiff in the sum of $941.50. The defendants interposed an answer and counterclaim. In their answer they admit the collision, that the defendant Bjornstad was the owner of the truck and that the defendant Erlandson was operating the truck as an employee of the defendant Bjornstad at the time the collision occurred. They alleged that the collision was caused by the negligence of the plaintiff; that at the time of the collision plaintiff's automobile was standing on the traveled portion of the highway and that there were no lights thereon either at the front or at the rear. They further allege by way of counterclaim that the truck was damaged to the extent of $1200 and they ask judgment that plaintiff's action be dismissed and that the

defendant Bjornstad recover from the plaintiff $1200 for the damage to the truck. The plaintiff interposed a reply denying all the allegations of the counterclaim, except the allegations that the defendant Bjornstad was the owner of the truck and that the plaintiff was the owner of the automobile. The parties waived a trial by jury and the case was tried to the court without a jury. The court made findings in favor of the defendants and ordered judgment in favor of the defendant Bjornstad for $800. Judgment was entered accordingly and the plaintiff has appealed and demands a trial anew in this court.

The collision occurred on State Highway No. 281 about three miles north of the City of Ellendale about 7:30 P. M. on October 24, 1947. The plaintiff was driving a 1942 five-passenger Studebaker automobile. His wife was a passenger. Plaintiff was driving in a southerly direction toward the City of Ellendale. Plaintiff and his wife both testified that they left plaintiff's brother's farm some eleven miles north of Ellendale a little after 7 o'clock that evening, and that when they left plaintiff's brother's farm the front lights and the tail light on the automobile were in working condition and in operation.

Plaintiff testified that as he approached the place where the collision occurred his car started "spitting and sputtering." He said, "I pulled off to the curb and I was going to pull the bowl off and take the water out of it." Later he explained that there was no curb on the highway in the sense that there was "something that stuck up." He testified that the highway was blacktopped and something like thirty or thirty-two feet in width, that it was constructed with sloping shoulders and sloping ditches and that it would be possible to drive "down off the highway at practically any point." He testified that he stopped the car on the blacktop, the traveled portion of the highway; that he did not see the lights of the vehicle approaching from the rear until after he had stopped his car and was just going to get out when his wife said, "Don't get out, wait until they get by." And so he did not get out of the car but waited for the vehicle approaching from the rear to pass. That the lights on his car were on and operating at the time. The plaintiff further testified that he also noticed the lights of another car

approaching from the south, that the lights on this car were dimmed, and that he (the plaintiff) also dimmed the lights on his car. Plaintiff testified that it had rained that afternoon and that it was cloudy that evening but that it did not rain at any time while they were driving home and that he had not been using the windshield wipers. Plaintiff testified that the truck struck the automobile straight from the rear, "pretty near directly in the back." That the impact shoved plaintiff's car about seventy-five feet. That the car before the collision was reasonably worth $1200 and that as a result of the collision it was reduced in value so that it was worth not to exceed $600. Plaintiff testified:

"Q. And did it damage your car?
A. Plenty.
Q. Well, what damage, do you remember?
A. Sprung the frame, knocked the tail light out, broke a spring.
Q. And what else?
A. I don't know. I haven't got it fixed yet. There are a lot of other things. It is all out of working order anyway."

There was no further evidence as to the damage inflicted upon the automobile or detail as to the particular parts of the automobile that had been damaged.

Plaintiff's wife, Magdalene Schaller, testified that when they left plaintiff's brother's farm shortly after seven o'clock that evening both the front lights and the tail light on the car were working and in operation. That it was cloudy but that there was no rain or mist. That as they were approaching the point where the collision occurred there seemed to be something the matter with the motor and her husband stopped the car. She said:—"He stopped way over to the side, clear over to the west side. He didn't stop in the ditch, but I opened the door as he was driving off the road to make sure he was far enough off the traveled portion of the road. The right-hand side of the car was off the traveled portion of the road." Magdalene Schaller further testified that the truck "struck the car about the center of the back." She stated that the lights on plaintiff's car were on at this time, that she didn't "know about the rear be-

cause we wasn't out of the car but the front ones were I know" and that the rear light was working at the time they left the plaintiff's brother's farm that evening.

Erlandson was called by the plaintiff for cross examination under the statute. Later he was called as a witness in his own behalf. On such cross examination he testified that at the time the collision occurred he was working for the defendant, Harry Bjornstad, moving buildings, that he was driving a truck belonging to Bjornstad and that such truck "ran into" the car belonging to the plaintiff Schaller. He testified that the ground and the road were level, where the collision occurred; that he did not know "just in feet" how wide the road was but that "it is plenty wide enough." In answer to the question, "What rate of speed were you driving when you run into him, about?", he said, "I should judge about thirty miles an hour." He testified that the lights and brakes on the truck were in good working condition. That shortly before the collision he noticed the lights of a car approaching from the south. When asked how far he was away from plaintiff's car when he first saw it he said, "I wouldn't venture to say. It was just a very short distance." When asked if he meant seventy-five or one hundred feet he answered, "Less than that. How close I couldn't say. It seemed to me I was right on top of it." He was then asked to give his best judgment. He answered, "that is pretty hard to say. I was blinded by the oncoming car." He testified that this car passed him at a point north of plaintiff's car. That he (Erlandson) dimmed the lights on the truck when he was some three or four hundred feet or more from the car that approached him from the south, that the driver of the car from the south did not dim his lights, that after the car which approached from the south had passed he (Erlandson) turned his lights back on high and that he then noticed the plaintiff's car. That he made an effort to turn out after he saw the Schaller car but that he stuck the left rear corner of the Schaller car with the right front end of the truck. When asked "how far did you push the car after you struck it?", he answered, "I don't think we pushed it hardly at all. It was a very few feet if anything. It slid side-

ways a little bit." He testified that there were no lights on plaintiff's car, either in front or rear.

When called as a witness in his own behalf the defendant Erlandson, on his direct examination, testified that the truck which he was driving was a three-ton truck belonging to the defendant Bjornstad. That he was an employee of Bjornstad, and that one Harvey Nelson, who was riding with him in the truck, was also an employee of Bjornstad. That they had driven the truck to work that same day, that it rained some in the forenoon and that they had delayed their departure until the rain stopped. That it was "misting" that evening and kept on drizzling off and on and that he used the windshield wipers off and on all the way that evening, and that the wipers were operating at the time of the collision. That shortly before the collision he noticed the lights of a car approaching from the south, that he (Erlandson) dimmed the lights of the truck when he was some three or four hundred feet or more from the car that was approaching from the south but that the driver of such car did not dim his lights, that after the car which approached from the south had passed he (Erlandson) turned the lights of the truck back on high and that he then noticed the plaintiff's car. When asked if he didn't slow down any when he met the car which came from the south, he answered, "Well, possibly some because he was bothering me so I couldn't see nothing, he was bothering me, he wouldn't turn his low lights on." When asked how much, if any, he slowed down he answered, "A few miles per hour. At the time I wasn't going over ten or fifteen miles an hour I don't think." In response to further questions he testified he couldn't say how fast he was going when he struck the Schaller car, that he wasn't going over thirty at any time. That he slowed down to about fifteen miles an hour when he hit the Schaller car, that when he turned his lights on high after passing the car which came from the south the Schaller car was right in front and not as much as fifty or sixty feet away. That it seemed to him that when he first saw the plaintiff's car he was only about twenty-five or thirty feet away from it, that he was then driving at the rate of approximately thirty miles an hour, that he "slammed on the

brakes" and started turning to the left as fast as he knew how. That he did not get past plaintiff's car but that he hit the left rear corner of plaintiff's car with the right front end of the truck. That when he hit plaintiff's car it was standing in the west driving lane on the traveled portion of the highway and that as a result of the collision the truck went across the road and in the ditch on the east side and that plaintiff's car slid over and was "heading out on the shoulder of the road" on the west side. That "the first thing" he did when he first saw the Schaller car was to put the "brakes on" and that the brakes were working. That he examined the truck some time after the collision and found that a hydraulic fluid hose was partly severed so that there were "no brakes left."

Harvey Nelson testified that he was working for the defendant Bjornstad and was riding in the truck with the defendant Erlandson at the time of the collision. That a couple hundred feet north of the Schaller car they met a car coming from the south. That the driver of such car did not dim his lights, but that the defendant Erlandson dimmed the lights on the truck. That he (Nelson) had not seen a light on any car in front of them and that he first noticed the Schaller car when the car coming from the south had passed the truck and after Erlandson had switched the lights on the truck back on high. That when he first saw the Schaller car it was only some thirty or forty feet away and that Erlandson then started "pulling and throwed his brakes on and started pulling to the left and hit Schaller." He testified:

"Q. Can you tell the Court what part of the truck you were riding in struck the Schaller car?
A. The right-hand side.
Q. Well, the front, the rear?
A. The front.
Q. Front, right front corner, then?
A. He hit, the truck, you mean?
Q. Truck hit the other car?
A. Hit his on the right-hand side, yes."

He further testified that the Schaller car was standing on the

blacktop in the driving part of the highway and that as a result of the collision the truck went in the ditch on the left-hand or east side of the road and that the automobile was pushed off to the west or right hand side of the road.

The defendant Erlandson and the witness Nelson testified that after the collision the parties got out of the respective vehicles and that both Erlandson and the plaintiff inquired as to whether anyone had been injured and that Schaller stated that it was his fault by stopping. The plaintiff and his wife both denied that the plaintiff made any such statement. The defendant Erlandson testified that he asked why there were no lights on plaintiff's car and that Mrs. Schaller answered that there were lights before "we hit them;" and that Mr. Schaller stated he couldn't say whether he had tail lights on or not.

The defendant Bjornstad testified that he was the owner of the truck; that the defendant Erlandson was his employee and was driving the truck at the time the collision occurred and that the truck and plaintiff's car were both damaged in such collision. He testified:

"Q. What was your truck worth before that collision?
A. Well, about $1600.
Q. And what was it worth after the collision?
A. Well, we had, $400, we had it estimated at.
Q. Well, but you say it was worth—
A. Yes, $400."

This is all the evidence that was offered as to the damage sustained by the defendant Bjornstad as a result of the collision. There was no evidence showing the details or the particulars in which the truck had been damaged other than the testimony of the defendant Erlandson to the effect that he examined the truck after the collision and found that a hydraulic hose was partly severed so that there were no brakes left in a working condition.

One Whelan, a deputy sheriff of the county in which the collision occurred, testified that he went out that evening to make an investigation and that he paced the distance from where the "impact was" that is, from the point where the truck hit

the car and that it was twenty-three paces from the point of impact to where plaintiff's car had stopped and that he estimated that the car had been pushed about seventy feet. This testimony was not contradicted. According to Whelan's testimony the defendant Erlandson was present at the time Whelan was there. Whelan further testified that the truck "was sitting pretty well on the east side—the left hand side" of the road coming from the north and that the automobile was on the right-hand side—the west side a little over the edge of the shoulder of the road. That on the day following the collision he and State Patrolman Albert Meyers examined the brakes on the truck which was then on the defendant Bjornstad's parking lot in Ellendale. In answer to the question in what condition he found the brakes he answered, "No brakes." He further testified that he knew nothing about the condition of the brakes on the truck before the collision.

The trial court found that the plaintiff stopped the car on the paved or improved and traveled portion of the highway and that there were no lights on the rear of the automobile and that the collision "was the result of the plaintiff's negligent act in stopping on the traveled portion of the highway without giving any signal and without any lights on the rear of his automobile." The court further found that there was no contributory negligence on the part of the defendant Erlandson.

We agree that the findings of the trial court relating to the acts of the plaintiff and the conclusion that these constituted negligence are in accord with the weight of the evidence.

Plaintiff testified that he stopped the car on the blacktop in the traveled portion of the highway. Plaintiff's wife testified that he stopped over to the side—clear over to the west side—and that she opened the door as he was driving off to make sure that the car was far enough off the traveled portion of the road and that "the right-hand side of the car was off the traveled portion of the road." It is apparent, therefore, that although the right-hand wheels of the car may have been off the main traveled portion of the highway the car was largely, if not wholly, upon the traveled portion of the highway. It is apparent that the plaintiff without any serious difficulty could have

driven the car farther to the side so as to have the whole thereof off the blacktop or traveled portion of the highway. Immediately after plaintiff stopped the car he became aware that a motor vehicle was approaching from the rear and that another motor vehicle was approaching from the south and that these two motor vehicles probably would meet and pass each other near or at the point where his car was standing. He did not attempt to move the car farther off the traveled portion of the road nor did he take any steps to ascertain whether the tail lights on his car were in operation. In view of the time of the day, the prevailing darkness, the existing weather conditions, and the surface of the road, we think the trial court was justified in concluding that the plaintiff was negligent in leaving the car standing where it was and in the condition in which it then was. We do not, however, agree with the trial court that the defendant Erlandson was free from negligence. On the contrary we believe the evidence establishes lack of care on the part of Erlandson which directly contributed to the accident.

The laws of this state (NDRC 1943) provide:

Sec. 39–0901. "Any person driving a vehicle on a highway shall drive the same at a careful and prudent speed not greater than is reasonable and proper, having due regard to the traffic, surface, and width of the highway and any other conditions then existing. No person shall drive any vehicle upon a highway at a speed to endanger the life, limb, or property of any person."

Sec. 39–1022. "No person shall park or leave standing any attended or unattended vehicle upon:

1. The paved or improved or main traveled portion of any highway outside a business or residence district when it is practicable to leave such vehicle standing off the paved or improved or main traveled portion of such highway;

2. Any highway unless a clear and unobstructed width of not less than fifteen feet shall be left for the free passage of other vehicles upon the main traveled portion of such highway opposite such standing vehicle; nor

3. Any highway unless a clear view of such vehicle may be obtained from a distance of two hundred feet in each direction upon such highway. . . .

but such provisions shall not apply to the driver of any vehicle which is disabled while on the paved or improved or main traveled portion of a highway in such a manner and to such an extent that it is impossible to avoid stopping and temporarily leaving such vehicle in such position."

Sec. 39–1119. "Whenever a motor vehicle is parked or stopped upon a highway, whether attended or unattended, during the time mentioned in section 39–1101, there shall be displayed thereon one or more lamps projecting a white light visible under normal atmospheric conditions from a distance of five hundred feet to the front of such motor vehicle and projecting a red light visible under like conditions from a distance of five hundred feet to the rear, except that local authorities may provide by ordinance that no lights need be displayed upon any such motor vehicle when parked upon a highway in accordance with local ordinances, where there is sufficient light to reveal any person within a distance of two hundred feet upon such highway."

Sec. 39–1101. "During the period elapsing from one-half hour after sunset of each day to one-half hour before sunrise of the following day, and at any other time when there is not sufficient light to render clearly discernible any person on the highway at a distance of two hundred feet ahead, every motor vehicle upon a highway, (except as otherwise provided in Sec. 39–1119 relating to lights on parked vehicles), shall be equipped with lighted front and rear lamps in the manner provided in this chapter for the different classes of vehicles."

Sec. 39–1004. "Whenever a motor vehicle meets another motor vehicle on any highway, the operator, at a distance of not less than five hundred feet, shall tilt the beams of the head lamps downward or substitute therefor the light from an auxiliary driving lamp or pair of such lamps, subject to the requirement that the tilted head lamp or auxiliary lamp or lamps shall give sufficient illumination under normal atmospheric conditions and on a level road to render clearly discernible a person seventy-five feet ahead, but shall not project glaring or dazzling light to persons in front of the vehicle. . . ."

Sec. 39–0902. (As amended by Laws 1947, Chapter 275.)

"Subject to the provisions of section 39–0901 and except in those instances where a lower speed is specified in this chapter, it presumably shall be lawful for the driver of a vehicle to drive the same at a speed not exceeding:

1. Twenty miles an hour when approaching within fifty feet of a grade crossing of any steam, electric, or street railway when the driver's view is obstructed. A driver's view shall be deemed to be obstructed when at any time during the last two hundred feet of his approach to such crossing he does not have a clear and uninterrupted view of such railway crossing and of any traffic on such railway for a distance of four hundred feet in each direction from such crossing; . . . .

3. Twenty miles an hour when approaching within fifty feet and in traversing an intersection of highways when the driver's view is obstructed. A driver's view shall be deemed to be obstructed when at any time during the last fifty feet of his approach to such intersection, he does not have a clear and uninterrupted view of such intersection and of the traffic upon all of the highways entering such intersection for a distance of two hundred feet from such intersection;

4. Twenty miles an hour in traversing or going around curves or traversing a grade upon a highway when the driver's view is obstructed within a distance of one hundred feet along such highway in the direction in which he is proceeding; . . .

8. The highway commissioner may designate specific areas of state highways where the maximum speed limit of sixty miles per hour for passenger vehicles from sunrise to sunset is permissible. The maximum speed limit for all trucks shall be fifty miles per hour. A lower speed limit than fifty miles per hour may be designated for all vehicles in certain areas by the commissioner if in his opinion conditions warrant this action. Fifty miles per hour under all other conditions.

In any case when the speed limitations provided for in the foregoing subsections shall be unsafe, it shall be unlawful to operate

a motor vehicle at such speed. It shall be prima facie unlawful for any person to exceed any of such foregoing speed limitations except as otherwise provided in section 39–0903. . . ."

(Section 39–0903 relates to speed limitations fixed by the governing bodies in cities and villages.) The above quoted provisions evidence a clear intent that the maximum rate of speed prescribed by the law is not always permissible under any and all circumstances but that such limitations are themselves subject to the primary rule that the speed must be reasonable and proper under the existing conditions at the place of operation (60 CJS pp 685–686; Tews v. Bamrick, 148 Neb 59, 26 NW2d 499), and that one of the conditions of the right to drive at the statutory maximum rate of speed is freedom from obstruction of the view ahead. I Blashfield Cycl Auto L & Pr, Permanent Edition, p 663, Sec 743.

Corpus Juris Secundum (60 CJS p 687, sec 291) says: "The propriety of any rate of speed cannot be fixed by any definite number of miles per hour, but what is a reasonable speed is dependent largely upon the situation and surrounding circumstances." The driver of a motor vehicle at night in the dark is required to exercise care commensurate with the situation. I Blashfield, Cycl Auto L & Pr, Permanent Edition, Sec 741, p 652 et seq. Where the vision of the driver of an automobile is obstructed for any cause ordinary care requires him to proceed with more caution than where he has an unobstructed vision. 5 Am Juris, Automobiles, p 652, Sec 269. The driver of an automobile whose vision is obscured by atmospheric conditions such as fog, or rain, must exercise care commensurate with the situation and a person driving an automobile at night and finding himself blinded by a glare of light is bound to exercise care commensurate with the situation to avoid inflicting injury on others who may be using the street or highway while he is thus unable to see what is before him. 5 Am Juris, Automobiles, pp 652–653, Sec 270–272.

"A speed which might be reasonable and proper under ordinary circumstances may be excessive and improper where the driver's view of the highway is in any way interfered with, as where he is confused or partly blinded by the headlights of

an approaching vehicle or by sunlight, or by a street light, or where he is driving through fog, smoke, dust, or snow, or his windshield is covered with sleet and snow, frost or rain. The speed is excessive whenever it places the car beyond the control of the driver when passing an obstruction, but, generally, if the operator can stop within the distance within which he can clearly see ahead, he is not driving at a negligently excessive rate of speed, there being no other variable factors present." 60 CJS, Motor Vehicles, pp 699–700.

"The fact that the headlights of an approaching vehicle make it more difficult for a motorist to see persons on the side of the road does not relieve him of the duty to use proper care to observe their presence, but rather requires him to exercise greater caution in that respect." I Blashfield, Cycl Auto L & Pr, Permanent Edition, Sec 744, p 663.

"A temporary obstruction of the view of a motorist will ordinarily affect his rate of speed, and require increased diligence. Under such circumstances he must exercise reasonable care to avoid a collision, and such care requires him to stop if necessary or to substantially lessen his speed before plunging headlong into such an obstruction. . . .

"A motorist cannot assume that his course of travel is free of danger or obstruction, in absence of the ability to see clearly ahead." I Blashfield, Cycl Auto L & Pr, Permanent Edition, Sec 743, pp 661, 663.

In Bagan v. Bitterman, 65 ND 423, 428, 259 NW 266, 267, this court said:

"In Billingsley v. McCormick Transfer Co., 58 ND 913, 919, 228 NW 424, 426, we show that no one has a right 'to wilfully and carelessly crash into even an unlighted machine, and then say he is entitled to damages because the other party was negligent as a matter of law, even though the violation of the statutory requirement may be negligence per se. Such negligence does not relieve the plaintiff from the consequences of contributory negligence.' . . .

"More and more the 'rule of safety'—the rule that one must drive at such a speed as to be able to stop within the assured clear

distance ahead—is being recognized as the imperative duty of the driver. As said in the very recent case of Garrison v. City of Detroit (Mich) 258 NW 259, where defendant cited cases based on such rule: 'The cases dealt with large objects, such as other motor vehicles, easily seen, and on the open road. A driver must anticipate such objects, lighted or unlighted, carefully or negligently driven or parked, and guard against collision with them. He must see such obstruction as a careful person would have seen.' "

The undisputed testimony shows that it was dark and that the weather was cloudy. According to defendant's own testimony it was misting and drizzling. He found it necessary to operate the windshield wipers for some distance before he reached the point of the collision and to continue to operate them and was operating them at the time of the collision. He was driving on a blacktopped highway where the headlights at best are none too effective. He was driving a three-ton truck. He observed the lights of a car approaching from the south. The defendant testified that the lights on the truck were in good working order and when on high would light the road ahead for a distance of at least two hundred feet but would not light the road for that distance when the lights were dimmed. He knew that he would soon meet and pass the vehicle approaching from the south. He knew it would be incumbent on him to dim the lights on the truck shortly before the two vehicles met and passed each other. He knew that this would result in lessening the range of the lights of the truck and his range of vision. There is no testimony on the part of the defendant that he was exercising any particular caution or keeping any special lookout. The testimony does not show the speed at which the car approaching from the south was being operated nor does it show for what distance the defendant had observed the lights on such car. It is undisputed, however, that the highway was level and perfectly straight. There were no dips or swells. There was no obstruction to vision except such as was produced by the darkness, atmospheric conditions and the lights. The defendant testified that such car met and passed the truck north of

the Schaller car. Nelson testified that such car met and passed the truck at a point some two hundred feet north of the Schaller car. The defendant Erlandson testified that he "was blinded by the oncoming car." He did not testify how far he was away from the oncoming car when he became aware of the blinding lights but apparently he did not see fit to indicate to the driver of the oncoming car that the lights were causing him trouble as he testified that he did not dim the lights of the truck until he was some three or four hundred feet or more distant from the car, although the statute (Sec. 39–1004, supra) required that he dim the lights at a distance not less than five hundred feet from the approaching vehicle. When asked if he slowed down any when he met the car he answered, "Well, possibly some because he was bothering me so *I couldn't see nothing.*" The traffic was not congested. Erlandson was in no danger of getting entangled with other vehicles that were going or coming. So far as the highway and traffic conditions were concerned there was nothing to prevent him from slowing down or stopping, when it became impossible for him to see. The highway was wide and hard-surfaced. He did not stop. He did not even slow down in any appreciable degree, if at all. When asked as to the rate of speed at which he was driving he stated that he was driving at the rate of thirty miles an hour when he hit the car. Later he gave different estimates as to his speed. He even testified that he was driving not more than ten or fifteen miles an hour. The trial court found that prior to the collision the defendant was driving at a speed of from thirty to thirty-five miles per hour and that just prior to the collision he slowed the truck down about five miles an hour which would leave a speed of twenty-five or thirty miles an hour.

The defendant Erlandson testified that the right front end of the truck hit the left rear corner of the car and that he did not think they pushed the car hardly at all, that "it was a very few feet if anything." The plaintiff and his wife testified that the truck struck the car "straight in the back." The deputy sheriff Whelan went to the scene of the accident. The defendant Erlandson was there. Whelan paced the distance from the point of impact to where the car was standing and found that the

car had been pushed approximately seventy feet. Whelan's testimony was given after the defendant Erlandson had testified that he did not think they pushed the car hardly at all and that "it was a very few feet if anything." The defendant Erlandson did not, nor did the witness Nelson, give any testimony in rebuttal of Whelan's testimony. The record discloses no reason to doubt the correctness of his testimony. There was no evidence as to the appearance of the vehicles after the collision. The only evidence as to the damage sustained by the parties was the testimony of the respective owners as to the lessened value of the vehicles as a result of the collision, coupled with the testimony of Erlandson that a hydraulic fluid hose had been severed on the truck and the testimony of the plaintiff that as a result of the collision the frame of the car was sprung, the tail light knocked out, a spring broken and "a lot of other things" and that the car was "all out of working order." Neither of the vehicles was overturned. They both remained standing in upright positions, heading in a southerly direction. So the damages to both the truck and to the car were caused solely by the force of the impact. The distance that the car was driven forward and the extent of the damages which both parties declare that the vehicles sustained indicate that the truck must have been traveling at an excessive rate of speed. See Elrich v. Schwadder, 251 Mich 33, 34–35, 230 NW 902, 903; Thompson v. Southern Michigan Transp. Co., 261 Mich 440, 449, 246 NW 174, 177.

A careful consideration of the evidence brings us to the conclusion that the defendant Erlandson failed to exercise due care commensurate with the situation and the circumstances and that his failure to exercise such care contributed directly to the collision and that the collision would not have occurred if he had exercised such care. It follows, therefore, that the judgment appealed from must be affirmed insofar as it orders a dismissal of plaintiff's action; but it must be reversed insofar as it awards to the defendant Bjornstad judgment against the plaintiff for $800 for damages to the truck; and the trial court is directed

to vacate such judgment and to order judgment that the counter-claim be dismissed.

NUESSLE, C. J., MORRIS, BURKE and GRIMSON, JJ., concur.