FUYUKO NAGATA, TOKIWO NAGATA AND JACK NAGATA, BY TOKIWO NAGATA, HIS NEXT FRIEND *v.* KAHULUI DEVELOPMENT CO., LTD., A HAWAII CORPORATION.

No. 4478.

NOVEMBER 3, 1966.

RICHARDSON, C.J., CASSIDY, WIRTZ, LEWIS AND MIZUHA, JJ.

OPINION OF THE COURT BY WIRTZ, J.

This is an appeal from the judgment for the defendant-appellee entered pursuant to the order granting the motion for a directed verdict made at the close of the evidence.

The plaintiffs-appellants are husband and wife. In the early hours of the morning of January 16, 1961, Mrs. Na-

gata was driving the family automobile, with her husband sitting in the front seat on her right and their son on the back seat. She was on the way to drop their son off at school and her husband at work. She was familiar with the road having traveled the same route every morning during the previous four months ever since her son had been enrolled in school the previous September. After leaving their home on Kea Street in Kahului, Maui, she turned right at the intersection into Wakea Avenue, a two-lane road, the paved portion being twenty-four feet in width. She was traveling in a more or less easterly direction into the rising sun which at that time was very low in the sky and was quite bright. Upon rounding a bend in Wakea Avenue the sun was squarely ahead. After the bend, the road ran almost directly east and the sun was off to the right, its position being at that time twenty-five degrees south of east. At this point, while Mrs. Nagata "was able to see the road," the rays of the sun "blocked out quite a bit of the right side of the road," despite the sun glasses she was wearing. Also she was "not completely" able to see the entire width of the road as "there were places where there were deep shadows" cast by kiawe trees bordering the southerly or right side of Wakea Avenue. She could see the oncoming traffic at the intersection of Wakea Avenue and Kamehameha Avenue some distance away. Despite her impairment of vision she proceeded along Wakea Avenue at the same rate of speed, which she estimated to be approximately twenty to twenty-five miles per hour, until her husband suddenly called out for her to "look out" at which time she removed her foot from the gas pedal. Almost instantaneously she crashed into the left rear end of a trailer which was partially off the road and parked at an angle so that seven feet of it extended onto the pavement. The trailer was not an inconsiderable object, being characterized as one of the largest trailers on

Maui, as it weighed ten tons and was forty-one feet in length and twenty and a half feet in width. It was of the "flat-bed" type, the bed being five or six inches thick, and stood four feet high in the front, tapering off to three feet in height at the rear with six or eight tires larger than those of the average automobile. It was parked at a distance in excess of two hundred feet from the intersection of Onehee Street with Wakea Avenue, which was the last intersection before the scene of the accident.[1] The exact nature of the bend in Wakea Avenue and the location of Onehee Street are not reflected in the record.[2] However, it does appear clearly from the testimony of plaintiffs' own witnesses that the scene of the accident was visible from

---

[1] The driver of the tractor-trailer marked the scene of the accident on the scale map of Wakea Avenue, in evidence as plaintiffs' Exhibit 1, which would indicate it to be a distance of at least 600 feet from any appreciable bend on Wakea Avenue. However, his testimony as to the location of the scene of the accident was somewhat garbled and it would appear that he meant to place the scene of the accident "about 300 or 400 feet" from the intersection of Onehee Street with Wakea Avenue.

One of the investigating officers placed the scene of the accident at approximately 300 feet from the intersection of Onehee Street with Wakea Avenue. Upon questioning this officer further indicated that he could not locate the scene of the accident more precisely with relation to a fixed object on the highway (usually a numbered utility pole) as "this is a non-traffic accident being it occurred on a private highway. If it was a regular traffic accident then we would take a pole number and measure for anything we had from there."

[2] The scale map of Wakea Avenue (plaintiffs' Exhibit 1) does not encompass the entire bend but what is shown indicates a bend of slight curvature of four degrees. A rough sketch hand-drawn by Mrs. Nagata during the course of her testimony and placed in evidence as defendant's Exhibit A shows a sharp bend and places the intersection of Onehee Street with Wakea Avenue just as you enter the bend approaching the scene of the accident.

The rough sketch, when offered in evidence as defendant's Exhibit A, was received for the limited purpose outlined in the objection of plaintiffs' counsel:

"* * * only for that purpose [clarification of Mrs. Nagata's testimony] we have no objection but if it is for the purpose of showing an accurate location of the different streets and the relationship of the distances on the road, we would object to it. If it is *only for the purpose of describing what the testimony is* we have no objection." (Emphasis added.)

the intersection of Onehee Street with Wakea Avenue[3], at a distance ranging from two hundred to four hundred feet.

In explanation of why she did not see the parked tractor-trailer Mrs. Nagata testified to the effect that after she rounded the bend and when "the sun started obscuring the right side of the road" she was approximately forty-two feet, six inches (the depth of the courtroom) from the scene of the accident. Her counsel admitted during the argument in this court that, as is reflected by the record, the distance actually "was considerably more." Mrs. Nagata also testified that, under normal conditions, the farthest away from the scene of the accident she could have first seen the parked vehicles was this same distance of forty-two feet, six inches,[4] although she acquiesced in the characterization of the bend as being "gradual" and conceded that there was nothing to obstruct her view across the bend and along Wakea Avenue beyond the scene of the

---

[3] One of the three investigating officers testified that as he approached on Wakea Avenue in the same direction taken by Mrs. Nagata he could see the scene of the accident "as soon as [he] passed the last intersection" which was "approximately between 200 to 300 feet, somewhere in there."

The driver of the tractor-trailer, called by plaintiffs, upon questioning as to how long after he had parked the tractor-trailer the accident took place, testified "I seen the car about three or four hundred feet in the back, this fourth car, and how long does it take to travel three or four hundred feet, could have been a couple of seconds." This ties in with his testimony that he had placed the scene of the accident "about three or four hundred feet" from the intersection of Onehee Street with Wakea Avenue.

[4] Her counsel, in his reply brief, questioned the factual statement of opposing counsel with the following statement:

"The following appearing on page 6 of the answering brief is erroneous: '. . . and could have first seen the trailer on a clear day without sun glare at a distance of forty-two and one-half feet, T. 40, 41, 47, . . .'"

When asked at the argument to elaborate on this statement, he stated:

"I believe what I was trying to point out was that if it were on a clear day, without sun glare, she could have seen from a greater distance. That's what I wanted to point out."

accident to Kamehameha Avenue.[5] Later in her testimony she admitted that she "was not very good at judging distances or the height of anything." She felt that driving at a speed of twenty to twenty-five miles an hour she would have been able to stop her car within this same distance of the length of the courtroom (forty-two feet, six inches). It would thus appear that Mrs. Nagata would have been able to stop in time had not her vision been impaired by the sun for the whole distance in which the tractor-trailer

---

[5] Her testimony was:

"Q You said the bend was gradual, I am wondering whether you can see across the bend, is there anything to obstruct your vision?

A No because the Maui Pine fence and things are over there.

Q Do they obstruct your vision down Wakea Street?

A No, not down Wakea Street, no.

Q You were driving down Wakea Street?

A That's right.

Q Can you tell me how far back on Wakea Street is the point where you first can see where the accident happened under normal driving conditions?

A The depth of this courtroom.

Q The depth of this courtroom?

A Yes.

* * * * * * * *

Q Now you are telling now in normal driving conditions you only have that vision ahead of you?

A No, I am not saying vision ahead of me. You said how far from after I round the bend can I see where the accident took place.

Q No, not after rounding the bend. I want to know how far back you are when you can see where the accident is?

THE COURT: She doesn't understand your question counsel, apparently on the basis of the answer. Do you understand his question?

A He wants to know when I can see.

THE COURT: Not after you make the bend.

A No but from where if I drive on Wakea and I said here to there.

Q Then you said it is the depth of this courtroom?

A Yes.

Q What is there that obstructs your view beyond that point? What obstructs your view? Why is it you can't see beyond the depth of this courtroom?

A Oh, I can see beyond that but you wanted to know where, or you wanted to know to where I can see on the road.

Q Yes?

A From where I was driving?

Q If you are driving down Wakea as you were doing, what is the point here on Wakea where you are going to be able to see the accident scene? I want to know where that point is, how far away from the accident scene that point is. Do you understand the question?

A Yes.

Q What is your answer?

combination was visible under the conditions of the terrain,[6] which she estimated at forty-two feet, six inches, but which actually was more than two hundred feet.

The trial judge's ruling that Mrs. Nagata was guilty of contributory negligence as a matter of law under the evidence is the only question raised under this appeal.[7] This ruling by the trial judge was inherent in the granting of the motion for a directed verdict for the defendant.

---

A Oh, I see. Well, I guess it is still the same answer."

After she had marked a circle on Exhibit A to indicate the place where she could have first seen the scene of the accident under normal conditions, the trial judge pressed her about the distance:

"THE COURT: Yes, but we don't know what the distance is yet. Let's get that. Let me ask you that question. What is the approximate distance from that cross to that circle you just drew? You don't have to give it to me in feet but you know now from where you sit to the back of the courtroom is forty-two feet. Now keeping that in mind, is it more or less or what?

A Oh, might be a few feet more or less. I don't know. It is hard to tell, but it should be about the same because it is from where I could see before to there."

[6] She testified:

"Q In other words you are indicating, are you not, that the sun was low?

A Yes.

Q And was directly in front of your car as you rounded the bend?

A No, it was off to the right.

Q No, I think you testified that when you were at the spot where you could first see the accident scene the sun was directly ahead because you were turning that gradual curve to the left, isn't that right? Isn't that correct?

A Yes.

\* \* \* \* \* \* \* \*

Q That is why you didn't see the trailer isn't it?

A Because of the sun, yes.

Q Because the sun was shining directly into your car from a low angle?

A Not directly into the car, no. It was coming from a right angle, a little bit of right angle so that it, you know how rays shine down and obscure anything behind it.

Q So in your opinion that is why you did not see the trailer?

A That's right."

[7] The specifications of error are:

"1. The Court erred in finding that but one inference can be drawn from the facts.

"2. The Court erred in finding Mrs. Nagata guilty of contributory negligence as a matter of law.

"3. The Court erred in granting a motion for a directed verdict."

The test to be employed in deciding whether a directed verdict is proper is that the evidence and the inferences fairly drawn therefrom must be viewed in the light most favorable to the one against whom the motion is made. If reasonable minds might differ on the conclusions therefrom, the issue is one for the jury. If there is no conflict in the material evidence and but one inference can be drawn from the facts, it is the duty of the court to pass on the questions of contributory negligence and proximate cause as questions of law. *Young* v. *Price,* 47 Haw. 309, 313, 388 P.2d 203, 206, *rehearing,* 48 Haw. 22, 24, 395 P.2d 365, 367.

In considering whether the material evidence is conflicting, and the inferences to be drawn therefrom, the standard of care for an automobile driver whose vision has been impaired must initially be determined. In view of the realities of modern driving and traffic conditions, it may not be required of a driver whose vision has been impaired to come to a complete stop, but it is generally still required that a motorist whose vision has been impaired must either stop (if his vision is cut off completely) or proceed at such a rate of speed and with such control of his vehicle as to be able to stop in time to avoid any discernible object in the road ahead. See Annot., 22 A.L.R. 2d 292, 300.

The phrase "discernible object" has been explained as the contrast between an object such as a man, cow, horse or vehicle and one such as a thin wire or small stick (see *Lindquist* v. *Thierman,* 216 Iowa 170, 248 N.W. 504), or between seeability and a situation creating a trap by virtue of the conduct of the other party. See *Schildnecht* v. *Follmer Trucking Co.,* 330 Pa. 550, 199 Atl. 220, 222.

Most courts have liberally applied the rule by subjecting it to a number of qualifications, depending upon traffic conditions, the nature of visibility of the object obstructing

the road and the suddenness of the visual impairment. *Gaiennie* v. *Cooperative Produce Co.,* 196 La. 417, 199 So. 377; *Broussard* v. *Krause & Managan, Inc.* (1939 La. App.), 186 So. 384; *Thomas* v. *Thurston Motor Lines, Inc.,* 230 N.C. 122, 52 S.E.2d 377; *B. Kullman & Co.* v. *Samuels,* 148 Miss. 871, 114 So. 807; *Fullerton* v. *Kansas City* (1950 Mo. App.), 236 S.W.2d 364; see Annot., 22 A.L.R. 2d 292, 299, 304-310. Other jurisdictions have rejected the general rule above for the rule of reasonable care under such qualifying circumstances. *Hill* v. *Peres,* 136 Cal. App. 132, 28 P.2d 946; *Shields* v. *Oxnard Harbor Dist.,* 46 Cal. App. 2d 477, 116 P.2d 121; *Schassen* v. *Columbia George Motor Coach System,* 126 Or. 363, 270 Pac. 530. See Annot., 22 A.L.R. 2d 292, 298, 310-322.

The suddenness of the condition causing impairment of vision has materiality as to the opportunity given the driver to appreciate his situation and to react accordingly. A motorist who proceeds when his vision has been impaired, after having had time to adjust to the situation but failing to do so, is chargeable with contributory negligence as a matter of law. *Cf., Henderson* v. *National Mutual Cas. Co.,* 164 Kan. 109, 187 P.2d 508, 513. And it has been held that proceeding without reduced speed after visual impairment upon rounding a curve was ground for a directed verdict for the other party, the court noting that the lack of a warning light on the back of the other vehicle was immaterial because the driver would not have seen it. *Burr* v. *Fall River News Co.,* 75 R.I. 476, 67 A.2d 694, 696. Accord, *Mickens* v. *F. Strauss & Son, Inc.* (1946 La. App.), 28 So. 2d 84. *Cf., Lexington-Hazard Express Co.* v. *Umberger,* 243 Ky. 419, 48 S.W.2d 1066.

While not necessarily required to bring his vehicle to an immediate and complete stop, a motorist whose vision is impaired may proceed only if he ascertains that it is safe to do so. *James* v. *Edwards,* 68 Wash. 2d 174, 412

P.2d 123. And, see *Moan* v. *Aasen,* 225 Minn. 504, 31 N.W.2d 265, 266, where a motorist was held not to be negligent as a matter of law because he had ascertained that his lane of travel was free from obstruction and stayed in it, the question of contributory negligence there being a jury question.

As in the last cited case, most of the cases holding the conduct of a motorist whose vision is impaired to be a jury question do so on the ground, expressed or implied, among others, that such a motorist took some action, at least in those situations where he had an opportunity to do so, the action most often taking the form of slowing down in response to the impairment of vision. See generally, Annot., 22 A.L.R. 2d 292, 300-322; see also, *Fullerton* v. *Kansas City, supra* (1950 Mo. App.), 236 S.W.2d 364, 365; *Planters Wholesale Grocery* v. *Kincade,* 210 Miss. 712, 50 So. 2d 578, 581; *Wilson* v. *Dalton's Adm'r.,* 311 Ky. 285, 223 S.W.2d 978, 981. On the other hand failure to immediately reduce speed when suffering from visual impairment so as to bring the car under control and continuing on for two hundred and twenty feet at the same speed while still visually impaired has led to a finding of contributory negligence on the part of the motorist as a matter of law. *Piland* v. *Maryland Cas. Co.,* 85 F. Supp. 31, 34 (E.D. La. 1949), *affirmed,* 179 F.2d 678 (5th Cir. 1950). Accord, *Darling* v. *Browning,* 120 W.Va. 666, 200 S.E. 737; *Woodley & Collins* v. *Schusters' Wholesale Produce Co.,* 170 La. 527, 128 So. 469; *Safety Tire Service, Inc.* v. *Murov,* 19 La. App. 663, 140 So. 879; *Mickens* v. *F. Strauss & Son, Inc., supra; Albright* v. *Tatum* (1948 La. App.), 37 So. 2d 888; *Schaller* v. *Bjornstad,* 77 N.D. 51, 40 N.W.2d 59; *Wosoba* v. *Kenyon,* 215 Iowa 226, 243 N.W. 569.

The standard of care has been generally held to be the same whether the impairment of vision is caused by sun-

light or oncoming headlights. It would seem, however, that sunlight is inherently a pervasive condition as to which greater foreseeability and hence greater opportunity to take precautions is afforded. Annot., 22 A.L.R. 2d 292, 408. Further the character of sunlight *per se* in a context of sunrise and sunset yields an inference of a more inclusive visual impairment, and expectably so, than that resulting from oncoming headlights. Consequently, impairment of vision caused by sunlight should require an even greater degree of care on the part of the driver as more opportunity to react and adjust to the adverse visual conditions is present than when one's vision is suddenly and momentarily impaired by oncoming headlights.

Drivers who failed to reduce their speed when sunlight impairs their vision have been held contributorily negligent as a matter of law. *Havens* v. *Loebel*, 103 Cal. App. 209, 284 Pac. 676; *Toenges* v. *Schleihauf*, 368 Pa. 247, 82 A.2d 15; *Paquin* v. *St. Johnsbury Trucking Co.*, 116 Vt. 466, 78 A.2d 683, *rehearing denied*, 116 Vt. 474, 80 A.2d 669. *Cf.*, *Ulrikson* v. *Chicago, M., St. P. & P. Ry.*, 64 S.D. 476, 268 N.W. 369.

In *Ball* v. *Sears, Roebuck And Co.*, 223 F.2d 695 at 696 (5th Cir. 1955), a case differing from the present one in that it was an intersection case, the court stated:

"* * * 'when the vision of a driver of a motor vehicle is so obstructed or so obscured by sunlight, direct sunlight striking his eyes, to the extent that he could not see things on the road or the street ahead of him, it was the duty of the driver of the * * * truck to exercise all ordinary and reasonable care and diligence to avoid an injury to anyone who might rightfully be on the street in front of him, even to the extent, if need be, of stopping his truck, if he couldn't see ahead of him because of the bright sunlight in his eyes.'

"* * * testified that when he first became blinded

he 'started to apply the brakes at that time lightly,' and the uncontradicted proof is that he then went on, to all intents and purposes, blind, until too late to stop, it seems clear that there is no finding the jury could possibly make on the element of negligence other than that the defendant was guilty."[8]

With the foregoing standard of care in mind, the applicable evidence must be considered to determine whether there was a factual question for the jury. The issue before us on appeal is simply, whether or not from the applicable evidence it could possibly be concluded that Mrs. Nagata exercised the "care, caution and prudence required of a reasonably prudent person under the circumstances."

The conflict in the evidence is as to the conduct of the defendant's employees at the scene of the accident. This relates to the use or non-use of a warning light and the presence or non-presence of one of the employees with flags to guide oncoming traffic. Also the color of the trailer, whether it was yellow or dark and dirty in color or grayish, is disputed. However, this evidence relates primarily to the negligence of the defendant—which is not in issue here as such negligence is assumed—rather than to the contributory negligence of Mrs. Nagata. In any event the conflict is to be resolved in favor of the plaintiffs. Even though there were no warning lights or signalman and the trailer was dark and dull in appearance, it certainly becomes immaterial on the issue of contributory negligence in view of the testimony of Mrs. Nagata of her visual impairment as to her lane of traffic.[9] There is no substantial

---

[8] In the cited case the court was passing on a defendant's negligence. The principles involved are equally applicable to a plaintiff's contributory negligence.

[9]
"Q  Mrs. Nagata did you see any other vehicles in front of you traveling in the same direction you were traveling in?
A  No, I did not.
Q  Was this because of the sun's rays?

conflict between the testimony as to what occurred of the four witnesses who were at the scene of the accident. Our focal point becomes Mrs. Nagata's conduct, which is substantially reflected in the above statement of facts, and in assaying her conduct her own testimony is all important. Where her testimony is inconsistent and inconclusive in the matter of distances the testimony of the witnesses on her behalf, considered most favorably to her case, resolves the matter. The fact remains, and her testimony is conclusive on this point, that her vision was impaired because of the sun's rays. When confronted with this condition as she rounded the bend on Wakea Avenue she did nothing. She continued on at the same rate of speed (twenty to twenty-five miles per hour) and in the same fashion as she had before until warned by her husband immediately prior to the crash.

A  No, not right in front of me, no.
Q  I believe you testified on direct examination and again now you gave an inference that due to the sun's rays you could not see on the right hand side of the road, is that correct?
A  That's right.
Q  When did this condition start, where was your car at the time that you first found that you could not see on the right hand side of the road because of the sun?
A  As I was turning and after I rounded the bend.
Q  And how far away would that be from the scene of the accident? How far away were you when you [sic] vision was obscured by the sun, from the place where the accident happened?
A  Approximately?
Q  Pardon?
A  Approximately?
Q  Yes, I don't expect the distance to be exact of course because you were moving at the time, but approximately?
     THE COURT: Do you understand the question?
A  Yes, he wants to know from the point, from where the sun started obscuring the right side of the road.
Q  Yes, how far away from the scene of the accident, the place where you hit the trailer?
A  Just about this—the depth of this room."
NOTE: Upon measurement, the depth of the courtroom proved to be forty-two feet and six inches.
"Q  Now will you state whether you were able to see the road or not?
A  The road was clear. I mean I was able to see the road but the right side, the sun was coming from such an angle that the rays blocked out quite a bit of the right side of the road, but I could see the on-coming traffic."

Her testimony estimating the distance of forty-two feet, six inches as the distance from which she could have first seen the parked trailer and tractor under normal conditions and also as the distance from which she could have seen the scene of the accident after rounding the bend in Wakea Avenue, is confusing and inconclusive. She herself admitted that nothing obstructed her view across the "gradual bend" along Wakea Avenue and that she was not good at judging distances. Not only was her judgment of distances inconsistent under her own testimony but it was at variance with the testimony of her own witnesses (the investigating police officers and the driver of the tractor) taken in conjunction with the physical evidence. These witnesses all testified that the scene of the accident was visible approaching along Wakea Avenue from the intersection of Onehee Street, a distance ranging from two hundred to four hundred feet. Under these circumstances, even though the exact location of Onehee Street and nature of the curve in Wakea Avenue are not reflected in the record, no reasonable jury could fail to find that under normal conditions she could have seen the parked trailer and tractor from, at least, a distance of two hundred feet away. This was more than ample distance within which to have brought her vehicle to a complete stop if needs be. She testified that she could have stopped if she had seen the trailer, even within her estimated distance of forty-two and one-half feet. Her explanation for not slowing down or stopping was that she did not see the trailer because of the sun.

This was not a case of a sudden impairment of vision since she was aware of this condition of sunlight when she began her journey and even employed sun glasses to minimize its effect, the sun's rays becoming more direct as she came around the gradual curve on Wakea Avenue. She knew of the effect of the sunlight on her visibility and

did nothing about it even when it expectably became more severe.

Plaintiffs contend that in view of the shadows cast across the road by the sun and the "dull" coloring of the trailer, together with the lack of any warning signal light or flagman, a situation of entrapment was created rendering the trailer under the circumstances an indiscernible object. This theory of entrapment by shadow is inappropriate in view of Mrs. Nagata's testimony of almost complete visual impairment as to the right side of the road and her failure to take any positive action as a result of her condition.[10] In this connection it might be recalled that Mr. Nagata, who since he was not driving was not paying attention to the road but averted the glare of the sun by turning his head sideways, still saw the trailer out of the corner of his eye at the time he gave his warning which unfortunately was too late to avert the accident.

---

[10] Although the cases cited by plaintiffs properly apply the entrapment exception to the particular facts in those cases, the facts in the case at bar are distinctly different in that the plaintiff driver here failed to take any affirmative action upon being blinded. In *Mose* v. *Insurance Co. of Pa.* (1961 La. App.), 134 So. 2d 312, the court held the defendant, blinded by the lights of the approaching automobile, was not negligent in failing to perceive an unlighted farm wagon located only partially on the pavement, since it was such an obscure obstruction. But the court there significantly found that defendant had reduced his speed on being blinded by the lights and that there was no evidence that defendant was traveling at an unreasonable speed under the circumstances.

*Vowell* v. *Manufacturers Cas. Ins. Co.*, 229 La. 798, 86 So. 2d 909, upon which the *Mose* case, *supra*, relied heavily, did not involve a blinded driver. Further, the driver, who failed to perceive an unlighted, parked lumber truck, was exercising due care and caution as required by the then prevailing conditions.

In *Anderson* v. *Kist*, 229 Iowa 462, 294 N.W. 726, the court upheld the trial judge's submitting the issue of plaintiff's contributory negligence to the jury. But there the plaintiff driver had reduced his speed and dimmed his lights and the blinding apparently occurred almost simultaneously with the accident.

Finally, it should be noted that in *Albright* v. *Tatum*, *supra* (1948 La. App.), 37 So. 2d 888, the plaintiff was held contributorily negligent as a matter of law for failing to slow down to the point where, in his search of the road, he could make sure that all was clear ahead of him, despite the fact that the obstruction he ran into was a truck covered with the kind of tarpaulin used in wars to camouflage such trucks.

However, Mrs. Nagata never did see the trailer until after she had crashed into it.

Since Mrs. Nagata's vision was impaired she should have slowed down and even stopped if visibility was insufficient for her to proceed and still be able to stop in time to avoid a discernible object in her path. Had she been maintaining a lookout she would have seen the trailer, hardly an indiscernible object, as her husband did without "paying too much attention to the road."

Nothing contradicts Mrs. Nagata's testimony that she was unable to see along her own side of the road, either expectably so or for a long enough time that she should have taken some action to enable her to determine if anything was in front of her. Her conduct was not that of the ordinarily prudent person under the circumstances; her negligence was a proximate cause of the accident though not necessarily the sole proximate cause; and reasonable men could not, under the applicable standard of law, come to a different conclusion.

The issue of contributory negligence was therefore properly one of law for the trial judge. The judgment is affirmed.

*Meyer M. Ueoka (Ogata & Ueoka* of counsel) for plaintiffs-appellants.

*Roy A. Vitousek, Jr. (Pratt, Moore, Bortz & Vitousek* of counsel) for defendant-appellee.

---

### DISSENTING OPINION BY MIZUHA, J., WITH WHOM RICHARDSON, C. J., JOINS.

I cannot concur with the court's opinion that the plaintiff was guilty of contributory negligence as a matter of law.

In granting a motion for a directed verdict by the defendant on the issue of contributory negligence, " '* * *

the evidence and the inferences which may be fairly drawn from the evidence must be considered in the light most favorable to the party against whom the motion is directed and if the evidence and the inferences viewed in that manner are of such character that reasonable persons in the exercise of fair and impartial judgment may reach different conclusions upon the crucial issue, then the motion should be denied and the issue should be submitted to the jury.' * * *." *Young* v. *Price,* 48 Haw. 22, 24, 395 P.2d 365, 367; 47 Haw. 309, 313, 388 P.2d 203, 206.

Applying this standard to the evidence, I am of the view that reasonable persons may reach different conclusions as to whether plaintiff was contributorily negligent and the issue should be submitted to the jury.

Plaintiff testified on direct and cross examination as follows:

"Q  At the time that you were traveling will you state whether or not you saw any car in the front of you before you hit?

"A  No, there was no car in front of me going in the same direction I was going.

"Q  And will you state whether or not you saw any car from the other direction coming towards you?

"A  Well they might have just come onto Wakea and some were across Kamehameha Avenue or turning the corner there, but there was one or two way down by the corner coming.

  *      *      *      *      *      *

"Q  Now will you state whether you were able to see the road or not?

"A  The road was clear. I mean I was able to see the road but the right side, the sun was coming from such an angle that the rays blocked out quite a bit of the right side of the road, but I could see the oncoming traffic.

  *      *      *      *      *      *

"Q When you say that the sun's rays blocked out what do you mean?

"A Well it is so bright and then over there right at that place there is a big clearing right off the side of the road and that is where this trailer and tractor were parked and so the way the sun was shining through made the shadows of the trees covering that area and the trailer seemed to blend right in with the background, grayish looking, kiawe driftwoods and what have you.

"Q You mean color of the -

"A Color of the trailer. There was no unusual color for me to notice.

"Q Did you see anything blinking?

"A No.

\* \* \* \* \* \*

"Q In other words you are indicating, are you not, that the sun was low?

"A Yes.

"Q And was directly in front of your car as you rounded the bend?

"A No, it was off to the right.[1]

\* \* \* \* \* \*

"Q Mrs. Nagata did you see any other vehicles in front of you traveling in the same direction you were traveling in?

"A No, I did not.

"Q Was this because of the sun's rays?

"A No, not right in front of me, no.

"Q I believe you testified on direct examination and again now you gave an inference that due to the

---

[1] After the curve, plaintiff was traveling east. At 7:45 A.M. the sun was 6¼ degrees above the horizon, and 25 degrees south of east. At 7:50 A.M. the sun was 7¼ degrees above the horizon and 25½ degrees south of east.

sun's rays you could not see on the right hand side of the road, is that correct?

"A  That's right.

"Q  When did this condition start, where was your car at the time that you first found that you could not see on the right hand side of the road because of the sun?

"A  As I was turning and after I rounded the bend.

"Q  And how far away would that be from the scene of the accident? How far away were you when you [*sic*] vision was obscured by the sun, from the place where the accident happened?

"A  Approximately?

"Q  Pardon?

"A  Approximately?

"Q  Yes, I don't expect the distance to be exact of course because you were moving at the time, but approximately?

"THE COURT: Do you understand the question?

"A  Yes, he wants to know from the point, from where the sun started obscurring [*sic*] the right side of the road.

"Q  Yes, how far away from the scene of the accident, the place where you hit the trailer?

"A  Just about this—the depth of this room.

     \*      \*      \*      \*      \*      \*

"MR. VITOUSEK: May the record show during the recess we measured the distance from the jury box to the end of the courtroom and it is forty-two and one-half feet.

"THE COURT: When you say jury box you mean from where she is sitting?

"MR. VITOUSEK: About from her eye level, her eyes position.

"THE COURT: The record will so show.

     \*      \*      \*      \*      \*      \*

"Q Mrs. Nagata, you stated that there are some kiawe trees growing?

"A Yes.

"Q Kiawe trees were growing alongside the road, is that correct?

"A Yes.

\* \* \* \* \* \*

"Q How tall would you estimate these kiawe trees were?

"THE COURT: Or how high?

"A I couldn't say. I am not very good at judging distances or the height of anything.

"Q Ten feet, twenty feet, forty feet, fifty, sixty?

"A Oh, I guess anywhere from fifty feet.

"THE COURT: Are you taking into consideration the fact that the length of this courtroom is about forty-two feet? Is that right?

"MR. UEOKA: Yes.

"THE COURT: Keeping that in mind, he is asking you for the height.

"A Well I guess from here about this, some were higher, some are lower, you know kiawe trees grow haphazardly.

"Q Now there was some mention during cross examination about glare of the sun. Now the sun was shining from the right through your windshield, is that correct?

"A Yes.

"Q Now as you were driving along will you state whether or not you were able to see the road?

"A Yes, I was able to see the road.

"Q Were you able to see the entire width of the road?

"A Not completely, there were places where there were deep shadows, you know, but I could see the oncoming traffic and when you drive along you are

more particularly aware of the oncoming traffic and—well."

The empty trailer was drawn by a tractor, which was parked at an angle entirely off the highway in the shadows cast by the morning sun. The trailer, a flat bed type, was forty feet long and twenty and one-half feet wide, four feet high in the front and three feet high in the back. The bed of the trailer was six inches thick, dark and dirty or grayish in color and it blended into the surrounding area which was enveloped in shadows. The trailer was parked at an angle off the highway with its left rear corner extending seven feet out over the pavement from the shoulder of the road.

I have no quarrel with the fact that the trailer was not an "inconsiderable object" if it were parked properly on the highway. But I cannot agree with the court that the trailer as it was peculiarly parked on the highway at 7:45 A.M. was a "discernible object" as a matter of law.

The logical inference which may be fairly drawn from plaintiff's testimony, and other evidence which must be considered in the light most favorable to the plaintiff, is that the right side of the road was covered by the long shadows cast by abutting trees and foliage from the early morning sun thereby causing the trailer to be not easily discernible, because of its dirty, grayish color and peculiar and unorthodox manner in which it was parked. There were no signs or flags to warn oncoming traffic.

The court's opinion states that "it does appear clearly from the testimony of plaintiff's own witness that the scene of the accident was visible from the intersection of Onehee Street with Wakea Avenue, at a distance ranging from 200 to 400 feet," and that plaintiff's vision was impaired "actually more than 200 feet." This conclusion is not sustained by the record.

Plaintiff testified that the distance she traveled between

the time her vision was impaired and the accident was forty-two and one-half feet. Onehee Street does not appear on Plaintiff's Exhibit 1, but does appear on Defendant's Exhibit 1[2] which was not drawn to scale by plaintiff and on which plaintiff shows the scene of the accident soon after the curve in the road past Onehee Street.

The location of the curve with relationship to the scene of the accident cannot be accurately determined on the exhibits in evidence. Defendant's Exhibit 1 was received for the limited purpose by the trial court for the clarification of plaintiff's testimony, but not "for the purpose of showing an accurate location of the different streets and the relationship of the distances on the road." Plaintiff's Exhibit 1 is an accurate scale map of Wakea Avenue running in an easterly direction with, approximately, a four degree curve. Onehee Street does not appear on the scale map. It is located somewhere to the west off the westerly edge of the scale map. The center of the curve on this scale map is 230 feet from the westerly edge of the scale map. Plaintiff did not locate the scene of the accident on this scale map. The only evidence we have placing the scene of the accident with relation to a curve or bend on Wakea is plaintiff's testimony. Any other testimony as to the scene of the accident with relation to the center of the curve or bend on Wakea Avenue is speculative because the exact location isn't in the record.

Therefore, when the court's opinion states that one of the investigating officers testified that "he could see the scene of the accident 'as soon as [he] passed the last intersection,'" [Onehee Street] "which was 'approximately between 200 and 300 feet, somewhere in there.'", it merely establishes the location of the accident with reference to

_____

[2] Plaintiff drew a sketch of the scene of the accident showing all the streets coming into Wakea Avenue. Defendant introduced the sketch into evidence.

the intersection of Onehee Street and Wakea Avenue but not with reference to the curve or bend as testified to by the plaintiff. Furthermore, the distance that this officer could see after he passed the intersection is an erroneous basis for this court to conclude that plaintiff could have seen as much because the officer came upon the scene at a time considerably later than when plaintiff traveled over the route earlier in the morning and the angle of the sun and light conditions had changed. Likewise, it can be generally assumed that it is easier to see an automobile wrecked on the highway when you are called to investigate an accident as compared to plaintiff's situation where there was only a trailer bed six inches thick unexpectedly protruding seven feet on the highway at 7:25 A.M. This officer placed the scene of the accident between 200 to 300 feet from the intersection of Wakea Avenue and Onehee Street. Although the exact center of the curve as testified to by plaintiff is not located on the scale map, the distance from the middle of the curve or bend on Wakea Avenue as it actually exists on the scale map (Plaintiff's Exhibit 1) to the [western] edge of said map toward Onehee Street is 230 feet. If inferences are to be fairly drawn from the evidence in the light most favorable to the plaintiff, the statement of this officer who places the scene of the accident between 200 and 300 feet from the intersection of Wakea Avenue and Onehee Street tends to corroborate plaintiff's testimony as to the scene of the accident being approximately 42½ feet after the bend or curve on Wakea Avenue.

Another investigating officer placed the scene of the accident at approximately 300 feet from the intersection of Onehee Street with Wakea Avenue. This also tends to corroborate plaintiff's testimony as indicated above.

The driver of the tractor-trailer located the scene of the accident on Plaintiff's Exhibit 1, which is drawn to

scale, at a point approximately 370 feet from the middle of the curve or bend, or a total of 600 feet from the left [western] edge of the map towards Onehee Street. When asked how he arrived at that location of the accident, he stated "Well I am looking back at Kamehameha, that is the reason why. I knew Onehee Street, approximately from Onehee Street and I had traveled I would say about three or four hundred feet when I pulled over to the side from Onehee Street so now I am looking back from Kamehameha Avenue back. That is the reason why I am trying to mark off about three quarters of the roadway."

He further testified that "I seen the car about three or four hundred feet in back, this fourth car, and how long does it take to travel three or four hundred feet, *could have been a couple of seconds." Emphasis supplied.* He contradicts himself as to the distance, but if his testimony is to be accepted as to the lapse of time—a couple of seconds—then the plaintiff's car could have been only 58 feet away at 20 miles per hour, which would seem to corroborate plaintiff's testimony that her vision was impaired for a distance of 42½ feet.

Plaintiff's husband testified: "* * * it seemed to me the sun was pretty bright as we turned the corner and since I wasn't driving the car I turned my head sideways to look out of the car and as I did and as we made the turn I noticed an object on the road and so I yelled to my wife to watch out and then the next thing when I came to I was laying on the front seat * * *."

If we are to employ the test laid down by this court in *Young* v. *Price, supra,* the foregoing evidence and the inference fairly drawn therefrom places the scene of the accident right after the bend or curve on Wakea Avenue as testified to by the plaintiff, closer to forty-two and one-half feet rather than 200 to 400 feet.

The court's opinion departs from the rule laid down in

*Young* v. *Price, supra,* that "the evidence must be considered in the light most favorable to the party against whom the motion is directed * * *." It attempts to justify the ruling of the lower court by arguing against plaintiff's testimony as follows:

*First.* "* * * She acquiesced in the characterization of the bend as being 'gradual' and conceded that there was nothing to obstruct her view across the bend and along Wakea Avenue beyond the scene of the accident to Kamehameha Avenue." This statement fails to note that plaintiff testified that "the road was clear. I mean I was able to see the road but the right side the sun coming from such an angle that 'the rays blocked out quite a bit of the right side of the road, but I could see the oncoming traffic.'" Plaintiff's vision was impaired as to the right side of Wakea Avenue.

*Second.* "* * * She admitted that she 'was not very good at judging distances or the length of anything.' She felt that driving at a speed of twenty to twenty-five miles an hour she would have been able to stop her car within this same distance of the length of the courtroom (42' 6"). It would then appear that Mrs. Nagata would have been able to stop in time had not her vision been impaired by the sun for the whole distance in which the tractor-trailer combination was visible under the conditions of the terrain, which she estimated at 42' 6", but which actually was more than 200 feet." This statement assumes that the tractor-trailer combination was parked on the highway. The facts clearly indicate that just a portion of the trailer bed, six inches thick was parked at an angle, protruding seven feet on the highway. Likewise, I am at a loss as to how this court can conclude, as a matter of law, that the portion of the trailer was visible to the plaintiff for actually more than 200 feet in view of the testimony of the plaintiff, the plaintiff's husband, the driver of the

tractor-trailer and the investigating officer. In doing so the court departs from the rule adopted in *Young* v. *Price, supra,* and considers the evidence and the inferences which may be fairly drawn from the evidence in the light *most favorable to the party who makes the motion for a directed verdict. Emphasis supplied.*

The court's opinion dismisses the question of negligence of the defendant "as such negligence is assumed." But in this case "* * * the question of plaintiff's contributory negligence is so inextricably entwined with and dependent on the issue of defendants' negligence * * *." *Young* v. *Price, supra* at 25. "Usually, negligence and contributory negligence cannot be separated with scalpellic precision." *Gaines* v. *Northern Pacific Railway Company,* 62 Wash.2d 45, 48, 380 P.2d 863, 866. "Negligence and contributory negligence are not easily separated with precision and contributory negligence ordinarily cannot be determined without reference to the primary negligence of the defendant." *Kelley* v. *Bruch,* ...... Idaho ......, 415 P.2d 693, 697.

In *Farrow* v. *Ostrom,* 10 Wash.2d 666, 667, 117 P.2d 963, 964, the court said:

"* * * The questions of negligence and contributory negligence are usually so intimately related that the latter cannot be determined without reference to the former. Hines v. Chicago, M. & St. P. R. Co., 105 Wash. 178, 177, P. 795. There is no more justification for the court to hold a plaintiff guilty of contributory negligence as a matter of law than there is to hold a defendant guilty of negligence as a matter of law. Richmond v. Tacoma R. & Power Co., 67 Wash. 444, 122 P. 351. * * *"

The record before us presents a genuine issue of fact— whether a dirty, grayish empty trailer whose flat bed was only six inches thick and three feet high in the rear parked at an angle off the highway with its left rear corner ex-

tending seven feet on the pavement just past a curve or bend in the highway at a time when one-half of the highway was covered by long shadows was a "discernible object," and whether it created some risk or hazard to other approaching drivers on the highway. Furthermore, in such a situation, whether defendant was required to take steps commensurate with the danger created to warn and protect approaching drivers on the highway. Likewise, it is evident that under these circumstances, the conflict in the evidence relative to "the use or non-use of a warning light, the presence or non-presence of one of the employes with flags to guide oncoming traffic * * * the color of the trailer, whether it was yellow or dark or dirty in color or grayish are factual questions for the jury."

In view of the foregoing, it is impossible to conclude that the evidence considered in the light most favorable to the plaintiff and the inferences viewed in that manner are of such a character that reasonable persons in the exercise of fair and impartial judgment may not reach different conclusions upon the issue of contributory negligence.

I would reverse and remand for a new trial.